No. 32,837

EDNA P. GILPIN, *Appellant*, v. THAD S. BURCH, Administrator, etc., et al., *Appellees*.

No. 32,838

EDNA P. GILPIN, *Appellee*, v. THAD S. BURCH, Administrator, etc., et al. (JOSEPH M. PIAZZEK, *Appellant*).

(65 P. 2d 308)

Opinion filed March 6, 1937.

*Arthur J. Stanley*, of Kansas City, *C. B. Little*, of Olathe, *Edward E. Naber* and *David M. Proctor*, both of Kansas City, Mo., for appellant Edna P. Gilpin; *Oscar Raines*, of Topeka, for appellant Joseph M. Piazzek.

*A. L. Berger*, of Kansas City, *I. P. Ryland, P. R. Stinson, Arthur Mag, R. B. Thomson, Robert E. Rosenwald, Ben R. Estill* and *Erwin O. Kunau*, all of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

HUTCHISON, J.: The two appeals here under consideration were taken by the plaintiff and one of the defendants separately from the rulings, findings, conclusions and judgment of the trial court in an action brought in Johnson county on August 9, 1933, to contest the will of DeForrest F. Piazzek.

The will in question was executed on July 18, 1933. The testator died on July 21, 1933, and the will was admitted to probate on July

25, 1933. The testator was a half brother of both appellants and died at the age of 65 years without other natural heir or heirs under the Kansas law of descents and distributions. He had been twice married and was divorced from both wives. He had made two earlier wills, one in 1920 and the other in 1925, both of which had been revoked, and in each of which the plaintiff was a beneficiary but the half brother was not mentioned, and in each of them he made the Commerce Trust Company the executor.

The testator was a very successful business man and had accumulated an estate estimated at about $75,000. He was an educated man and was accustomed to handling large business affairs. At one time he received $25,000 a year as representative of the Federal Grain Corporation. He had received $10,000 for a number of years as manager of the Kansas City Club, which required business acumen and ability. In his normal condition he was possessed of a dominant mind, was a stickler for detail and was an experienced and good business man.

The grounds of the contest were that the testator was unduly influenced in the preparation and execution of the will and that he lacked testamentary capacity on July 18, 1933, to execute the will.

A copy of the will was attached to the petition. It gave to William E. Evans, who was designated in the will as "my good friend," his watch; to Joseph M. Piazzek, his half brother, his silver table service, his wearing apparel and mechanical tools; to the Valley Falls Cemetery Association in which his family burial ground was located, $5,000 for maintenance and upkeep of the cemetery; to a cousin, Nicholas Ifft, one thousand shares of stock in the Tribune Company, Ltd., of Pocatello, Idaho; to three women, two of whom had been in his employ, one, $1,000, another, $5,000, and the third, one hundred shares of stock in the Kansas City Stock Yards Company, and his automobile; to a neighbor he directed the installation of an electric water pump, drainage system and electric washing machine; to another friend who owned a half interest with him in a hundred-acre tract of land he devised the half interest owned by the deceased. He set aside $5,000 for his trustee to use for the care of two horses which he had raised from colts so they would be comfortably taken care of the balance of their lives without working. He gave to the trustee 208 acres of land, two town lots and a mortgage on a farm in trust to enable worthy, deserving and needy young men to secure an education in the University of Kansas, at Lawrence,

Kan. There was a modification as to the mortgage which was to be released if·the mortgagor made certain annual improvements thereon for five years. He made his half brother, Joseph M. Piazzek, his residuary legatee, specifically forgiving an indebtedness of $300. He made the First National Bank of Kansas City, Mo., trustee and executor of the will without bond, and in case it would not be eligible to serve as executor, the senior officer of the bank residing in Kansas was to be executor. The will was witnessed by the attorney who wrote it and by the day nurse at the hospital.

The plaintiff in her petition contesting the will made the trustee and executor and all the legatees, including the half brother, parties defendant. Answers were filed by all of them except William E. Evans. The executor appointed by the probate court was Thad S. Burch. He and the bank, as trustee, filed extended answers of general and special denial. The half brother filed an answer admitting the allegations of the petition.

The evidence of the plaintiff tended to show that in June, 1932, the deceased went to St. Luke's Hospital for diagnosis and examination, and it was found that he had a jaundice condition and an enlargement of the liver; that in May, 1933, he fell from a ladder while painting a building on his farm and injured his side and back; that he had the services of different physicians occasionally at his farm; that on July 7, 1933, a physician who was a boyhood friend, but had not·specialized along the lines which were troubling the testator, recommended that he go to the hospital and took him to St. Luke's Hospital in Kansas City, Mo., and recommended a special physician who attended him at the hospital until the 21st of July, 1933.

Many of his friends visited him during the two weeks he was at the hospital and had social and business conversations with him. He talked to some of them about preparing a will and asked for the name of a lawyer to do that work.

The appellants rely very largely upon the bedside notes or charts, especially during the last several days of his illness, to show his mental incapacity to execute a will, and most particularly upon the statements made in the bedside notes for the 18th day of July, 1933, the day on which he executed the will in question. Photostatic copies of these bedside notes were introduced in evidence, and copies of them for several days are contained in the abstract as well as the photostatic copies. The following is the copy of these bedside notes for July 18, the day on which the will was executed:

"Time A. M.

12:15  Morph. gr. ⅙ and atropine gr. 1/150.

12:45  Temp. 105.2 ax. Pulse, 136. H. D. fluid, 3 oz. Resp., 32. Ice cap to head. Temp. sponge. $H_2O$. Fluid, 3 oz. Pt. perspiring, expelling gas.

1:30  Temp. 103 ax. Pulse, 130. O. juice. Urine, 100cc. Fluid, 6 oz. Resp., 28.

2:00  Pt. distended—turpentine. O. juice. Fluid, 5 oz.

2:30  Stupes—30 min. $H_2O$. Fluid, 3 oz. Pt. turned on side, expelling gas. $H_2O$. Fluid, 3 oz. Resp., 22.

3:00  $H_2O$. Fluid, 2 oz.

3:30  Morph. gr. ⅙, 2 doses. $H_2O$. Fluid, 6 oz.

4:00  Morph. gr. ¼, 2 doses. $H_2O$. Fluid, 3 oz.

4:30  Sodium luminal gr. 3. $H_2O$. Fluid, 6 oz.

5:30  Soda enema. $H_2O$. Fluid, 6 oz. Resp., 24. Turpentine stupes, intake 5550cc. Output, 595cc.

6:50  Pt. has slept soundly since 5:30. Urine, 300cc. O. juice. Fluid, 7 oz.

7:10  $H_2O$. Fluid, 6 oz.

7:30  $H_2O$. Fluid, 6 oz.

7:45  Pt. perspiring. Urine, 50cc. Resp., 22. Colon tube inserted.

8:00  $H_2O$. Fluid, 3 oz.

8:10  Sleeping soundly.

9:15  $H_2O$. Fluid, 3 oz.

9:30  $H_2O$. Fluid, 3 oz.

10:00  Dr. Wilhelmy here.

10:10  Morph. S. gr. ¼, 2 doses for severe pain, atropine gr. 1/150, 2 doses in abdomen. Resp., 22. Diet, special. Ice bag to abdomen.

10:45  Pt. sleeping.

11:00  O. juice. Fluid, 2 oz.

11:25  Slight chill. Resp., 30.

11:45  Dr. Wilhelmy here. Urine, 75cc.

P. M.

      O. juice. Fluid, 3 oz.

1:00  Perspiring profusely. $H_2O$. Fluid, 3 oz. Resp., 22. Pt. sleeping most of time.

1:20  O. juice. Fluid, 6 oz.

1:50  $H_2O$. Fluid, 6 oz. Resp., 20.

2:05  $H_2O$. Fluid, 3 oz.

2:25  O. juice. Fluid, 6 oz.

2:35  Urine, 125cc.

3:20  Morph. S. gr. ⅙, 2 doses. $H_2O$. Fluid, 6 oz.

3:30  $H_2O$. Fluid, 2 oz. Resp., 20.

3:45  O. juice. Fluid, 6 oz.

4:20  Sleeping soundly.

Chg.

4:30   H₂O. Fluid, 3 oz.

5:00   O. juice. Fluid, 3 oz.

5:45   H₂O. Fluid, 4 oz.

6:00   Dr. Wilhelmy here. Resp., 20. Morph. gr. ¼, 2 doses.

6:30   Through colon tube—Dk. brown liq. stool, 30cc.

6:50   Sleeping soundly.

8:00   Pt. irrational. H₂O. Urine, 25cc. Fluid, 2 oz.

8:40   Getting restless. H₂O. Fluid, 3 oz. Resp., 22.

9:00   Dr. Wilhelmy here, 'orders' O. juice. Fluid, 3 oz. O. juice 9:15, 1 oz.; 9:24, 2 oz.; 9:35, 2 oz.; 10:00, 2 plus.; 10:30, 3 oz.; 2 oz. Ice cap to head and abdomen. Temp. sponge.

9:40   Sodium luminal, gr. 2 (intravenously). H₂O. 2 oz. 10:40, 2 oz. Urine, 250cc.

10:15   Sleeping lightly. Pt. perspiring.

10:30   Awake, hiccoughing and coughing. Has no pain. Resp., 22.

11:00   Sleeping; sighing in sleep; irregular. Temperature: A. M.: 12:45—105. 1 ax. 1:30—103 ax. 2:45—ax. 101. 5:20—ax. 102. 7:45—101 ax. 10:00—101.1. 11:30—101.2. P. M.: 1:00 —102. 1:50—101. 3:30—101.2 ax. 6:00—101 ax. 8:40—103 ax. 10:30—101 ax. Pulse: A. M.: 12:45—136. 1:30—130. 2:45—120. 5:00—120. 7:45—120. 10:00—94. 11:30—122. P. M.: 1:30—116. 1:50—110. 3:30—100. 6:00—110. 8:00—120. 10:30—110."

The attention of the court is directed to the above bedside notes of July 18 and those of other days to observe the evidence of the frequent giving of narcotics, morphine and other drugs to the deceased and the effect thereof on the mental capacity of the patient. There was also evidence of several physicians as expert witnesses answering hypothetical questions based upon the evidence contained in these bedside notes and the evidence of the attending physician as to the physical condition of the patient, the answers of the expert witnesses to the hypothetical questions being strongly in favor of appellant's contention that the testator was incompetent to execute a will when he did so on July 18. Some of these expert witnesses on cross-examination frankly admitted a modification of their views expressed, if other matters and things existed as stated in the cross-examination questions.

There was also evidence of a handwriting expert, who testified that the name of the testator to the will was made by the aid or assistance of a guiding hand. Other signatures of the deceased, admitted to be genuine, were introduced in evidence to show a distinction. Attention was also called to the insertion of the middle initial "F," written slightly above the rest of the name, and the use of "rr" in the name Forrest instead of one "r."

Some of the friends of the deceased testified as to his condition while in the hospital. One in particular who visited him frequently said that "after the first week I had to stand up and hold my head over him to hear what he had to say."

The court's attention was also directed to the fact that Mr. Sigler, the friend of the deceased to whom the deceased gave the information to be placed in the will, was an employee of the First National Bank, and that Mr. Bayse, the attorney who prepared and wrote the will, was working for the firm of attorneys regularly employed by the First National Bank which was designated in the will as trustee.

A witness for the plaintiff testified to having heard William E. Evans, a friend of the deceased and a beneficiary under the will, say to the half brother Joseph, "You ought to be satisfied with what I done for you. If I had not gotten Dee to sign the will the ex-wives would have come in and taken all of it and you would not get nothing." Other witnesses testified to having heard Mr. Evans say that he used his influence to get the deceased to sign the will, and that the deceased did not want to sign it because it was not exactly what he wanted.

There was evidence of witnesses conversing with Mr. Evans after the death of the testator when he said that he didn't know the deceased had a sister. The plaintiff and other witnesses in her behalf testified that special friendship and affection existed between her and the deceased, that he was her special adviser in matters of business and that he frequently sent her and her children generous gifts.

On behalf of the appellees the record shows positive evidence of the testamentary capacity of the testator on the day he executed the will and prior thereto. Among the witnesses so testifying were his regular physician at the hospital, Doctor Wilhelmy; the interne therein, Doctor Olson; the day nurse, Miss Cracroft; the night nurse, Mrs. Jackson; Mr. Sigler, the man who took down the data for the making of the will; Mr. Bayse, the attorney who prepared the will, and Doctor Wilhelm, a friend of the testator who took him to the hospital and frequently called on him while he was there. Some of these witnesses said it was not necessary to lean over the bed to hear the testator talk, but he could be heard speaking as ordinarily.

The witnesses to the will and Mr. Sigler said the testator signed the will and initialed the several pages thereof without the aid or assistance of a guiding hand, and wrote the initial "F" in between

the names and slightly above the line thereof when his attention was called to the fact that the initial appeared throughout the body of the will. None of the three last-named witnesses, who were present when the will was signed, heard Mr. Evans, who was also present at that time, say anything to the testator about the will. Mr. Sigler said that he reported the expressed desires of the testator to the lawyer who prepared the will and did not attempt to influence the testator in any of his plans. A number of letters were introduced tending to show a serious disagreement existing between the plaintiff and the deceased for the last few years of the life of the testator.

The trial court made twenty-one findings of fact, three of which are as follows:

"16. At the time said DeForrest Piazzek signed and published said written instrument as and for his last will and testament, he possessed mental capacity to execute a will; he understood the nature and quality of his act; he was capable of and did understand the purport and effect of the same; and he was capable of and did understand and realize and appreciate what disposition he was making of his property under the terms and conditions of said written instrument; he was capable of understanding and did understand the nature and extent of his property.

"17. At the time said DeForrest Piazzek signed and published said written instrument as and for his last will and testament, he possessed the mental capacity to realize and did realize who, if any one, might be deemed to be the natural recipients of his bounty.

"18. At the time said DeForrest Piazzek signed and published said written instrument as and for his last will and testament, he was not under any mental restraint or any undue influence whatever."

The conclusion of law is as follows:

"The instrument of writing dated July 18, 1933, and signed on said date by said DeForrest Piazzek, and which was duly filed for probate in the probate court of Johnson county, Kansas, and which was duly probated in said court and entered of record therein as and for the last will and testament of said DeForrest Piazzek, deceased, on July 25, 1933, is the valid and subsisting last will and testament of the said DeForrest Piazzek, who died on July 21, 1933, a resident of Johnson county, Kansas."

This is a fact case in which there was a conflict in the evidence on both of the questions involved, as to the deceased possessing testamentary capacity on July 18, 1933, when he signed the will, and as to his being unduly influenced in the preparation and execution of the will. In such a case the only duty or authority of a court of appeals is to determine from the conflicting evidence and the inferences to be drawn therefrom whether or not there was sufficient competent

evidence to support the findings of the trial court. We think there was, and therefore such findings are conclusive.

It was held in *Randall v. Bird*, 118 Kan. 341, 235 Pac. 103, which was a will case, that—

"The rule again followed that findings of facts, when sustained by evidence, are conclusive on appeal, although there was evidence on which a contrary finding could have been made." (Syl.)

In *Bruington v. Wagoner*, 100 Kan. 439, 164 Pac. 1057, it was held:

"The supreme court accepts as true the trial court's findings of fact when they are based upon competent evidence; and on appeal it is of no consequence that there may have been much contradictory evidence adduced at the trial, which, if believed by the trial court, would have compelled entirely different findings of fact and an entirely different judgment." (Syl. ¶ 1.)

A similar holding, in the case of *Bell v. Van Meter*, 133 Kan. 236, 299 Pac. 606, was:

"An appeal from a judgment of a trial court based on controverted questions of fact, where such judgment had ample, substantial evidence to support it, presents no legal question for review in this court." (Syl.)

Also, a similar holding was made in the case of *Bradley v. Hill*, 141 Kan. 602, 42 P. 2d 580, which is as follows:

"Where the trial court in an action to set aside a will and codicil because of the testamentary incapacity of the testator, holds under conflicting testimony that the testator was mentally competent to make the will and codicil, and such finding is sustained by substantial evidence, the finding is conclusive on appeal." (Syl. ¶ 1.)

In a still later case it was said in the opinion as to the validity of a will, that—

"The trial court considered this case and reached a conclusion as to the facts on conflicting testimony. Under such circumstances the result will not be disturbed." (*Steward v. Marker*, 143 Kan. 860, 865, 57 P. 2d 75.)

In the contest of a will in the case of *Gorman v. Hickey*, 145 Kan. 54, 64 P. 2d 587, it was said in the opinion handed down January 23, 1937, that—

"We can go no further than to concede that the evidence adduced by defendants, if its credence had been preferred by the trial court to that adduced by the plaintiffs, and if a contrary judgment had been reached by that tribunal whose function it was to settle controversies of fact, this court would have no difficulty in following its usual appellate practice. (*Bruington v. Wagoner*, 100 Kan. 439, 164 Pac. 1057.)" (p. 65.)

Most of these cases discuss the questions of testamentary capacity

and undue influence, and some of them consider the inferences to be drawn as to the latter from the conflicting testimony. We have attempted to apply the reasoning mentioned in these and other cases to the evidence and all the reasonable inferences applicable to the very voluminous evidence in the case at bar, and we feel very much as expressed in the last case above cited, that if a contrary judgment had been reached by the trial court, giving the other evidence superior weight and credence, this court would have had no difficulty in following its usual appellate practice.

We recognize the duty of courts, as stated in *Singer v. Taylor,* 90 Kan. 285, 133 Pac. 841, to scrutinize closely the circumstances surrounding the execution of the will to see if it was made with sufficient capacity and was the free act of the testator. The many conversations had by the testator with others about making particular bequests to friends and former help and his expressed desire to imitate the generosity of his friend who left a large bequest in trust for worthy and needy students of the universities of three states, tend strongly to show a well-developed intention to help these friends and students and show a reasoning mind rather than one being directed or influenced.

The fact that in his two previous wills, executed thirteen and eight years prior to the making of this one, he named a trustee to handle some of his property for the benefit of others is a strong reason in favor of his inclination to do the same at this time without any persuasion or influence. He just named a different financial institution at this time—the one with which he was doing more business than the one formerly named.

Appellants cite *Flintjer v. Rehm,* 120 Kan. 13, 241 Pac. 1087, and *Stafford v. Sutcliffe,* 103 Kan. 592, 175 Pac. 981, which hold wills void where the scrivener makes himself the beneficiary and where the will is prepared by a confidential agent without benefit of independent advice. Both these decisions depend upon what is now G. S. 1935, 22-214, about preparation of wills by confidential agents without the testator having the benefit of independent advice. The statute requiring independent advice is applicable to cases where—

". . . such will was written or prepared by the sole or principal beneficiary in such will, who, at the time of writing or preparing the same, was the confidential agent or legal adviser of the testator, or who occupied at the time any other position of confidence or trust to such testator."

In both of the above-cited cases the scrivener was the confidential

agent of the testator and the principal beneficiary under the will which appointed him executor without bond. The facts in the case at bar could hardly be put in that class. Even if the confidential agent in this case who took down the data for the will and the attorney who wrote it were in the employ of the trustee and executor, such parties were not the principal beneficiaries. Of course it was some benefit to the bank to have the additional business of being trustee for the estate, but a trustee is not a beneficiary ordinarily or as contemplated by the statute. Some argument ·is made as to Mr. Evans exerting an undue influence, but he was neither the scrivener of the will nor shown to have any part in the preparation of it and was a beneficiary only to the extent of a Swiss watch. (See *Rischel v. McPherson County*, 122 Kan. 741, 253 Pac. 586.)

Appellants insist that inasmuch as a substantial part of the testimony in this case was documentary, this court might disregard all the oral testimony adduced at the trial and determine the issues of this case from documentary evidence alone, although there was oral testimony strongly conflicting with the documentary. The documentary evidence consisted mainly of the bedside notes, depositions of physicians and others, the two former wills and numerous letters. As to the bedside notes, if we take them on the subject of the mental capacity of the testator at the time of executing the will and prior thereto, although they show high temperature, irregular pulse, severe pain and administration of different narcotics, morphine and drugs, they fail to show anything as to the patient being irrational prior to 8 p. m. on July 18, 1933, which was five hours after the execution of the will.

There was practically no documentary evidence on the question of undue influence. The cases cited where the appellate court has reversed the judgment of the lower court on the documentary evidence are generally where there was no oral evidence conflicting therewith. In the case of *Hegwer v. Kiff & Co.*, 31 Kan. 440, 2 Pac. 553, the evidence consisted wholly of affidavits. In the case of *Belknap v. Sleeth*, 77 Kan. 164, 93 Pac. 580, the findings of the district court were based entirely upon written and documentary evidence. In the case of *Palmer v. Johnson*, 132 Kan. 161, 294 Pac. 874, the court held:

"When the ruling of a trial court turns on documentary evidence this court can examine the documents and determine their meaning and effect, and is not bound by the interpretation given them by the trial court." (Syl. ¶ 1.)

The ruling in the Sleeth case, *supra*, was distinguished in the case of *Bartels v. School District*, 89 Kan. 233, 131 Pac. 579, where it was said in the opinion:

"Here, however, there is, as we have seen, oral testimony of a conflicting character on the vital points in the case, and the findings of the trial court based on such a conflict cannot be disturbed on appeal even if this court might have reached a different conclusion in an original investigation of the same testimony." (p. 237.)

Even if the conflict of evidence be disregarded in the case at bar, it is very doubtful if there is enough documentary evidence to support the contention of the appellants.

The appellants have cited many pertinent decisions from this court and the courts of other states upon the different elements or features of testamentary incapacity and undue influence, which have been considered but have not been cited or discussed herein, because of our having reached the general conclusion that there was sufficient competent evidence to sustain the findings of the trial court.

We find no error in overruling the motions to set aside certain findings and for a new trial.

The judgment is affirmed.