No. 33,620

Virginia Lee Salthouse Smith, *Appellee,* v. John Lee Salthouse, as Executor of the Estate of Ida M. Salthouse, Deceased; John Lee Salthouse and Emma Lou Salthouse Broadway, *Appellants* (Wirt C. Salthouse, a Minor, *Defendant*).

(76 P. 2d 836)

Opinion filed March 5, 1938.

*A. M. Ebright, P. K. Smith* and *M. P. Shearer,* all of Wichita, for the appellants.

*W. E. Holmes, Mark H. Adams, Howard L. Baker, Charles E. Jones, Edward F. Arn, W. D. Jochems, J. Wirth Sargent, Emmet A. Blaes, Roetzel Jochems,* all of Wichita, for the appellee.

The opinion of the court was delivered by

ALLEN, J.: This action was brought to set aside a codicil to a last will on the grounds of mental incapacity, fraud and undue influence. From a judgment setting aside the codicil, defendants appeal.

The will of Ida M. Salthouse was executed on August 14, 1922; the codicil in dispute was executed August 6, 1935. Testatrix died on August 13, 1935.

The trial of this case began on March 18, 1937, and was concluded on March 24, 1937, at which time the advisory jury returned answers to special questions, as follows:

"1. At the time of the execution of the purported codicil to her last will and testament on August 6, 1935, did Ida M. Salthouse have mental capacity sufficient to recognize the objects of her bounty, the extent and kind of property she owned, and the disposition she wished to make of the same? A. No.

"2. Did the defendants, or either of them, exert any fraud or undue influence or constraint on Ida M. Salthouse, deceased, to induce her to sign the codicil to her last will and testament? A. Yes.

"3. If you answer question number 2 in the affirmative, state (a) Who exerted such undue influence, fraud or constraint? A. John Lee Salthouse and Emma Lou Broadway. (b) State fully of what such undue influence, fraud or constraint consisted. A. Disturbance of peace of mind of testatrix by above parties."

Thereafter, on the 8th day of June, 1937, the findings of the jury were adopted as the findings of the court. The court made findings of fact and conclusions of law. Certain of the findings are as follows:

"1. John T. Salthouse and Ida M. Salthouse were married on November 3, 1885, at the city of McPherson, McPherson county, Kansas. To this union the following children were born: Wirt C. Salthouse, who at the present time

would have been forty-nine years of age, had he lived; Emma Lou Salthouse, now Emma Lou Broadway, defendant herein, who is now forty-six years of age, married, but without children; John Lee Salthouse, defendant herein, who is now forty-three years of age and who has never married.

"2. In the year 1911, Wirt C. Salthouse married Pearl Thomas, of Salina, Kan., and to this union were born the following children: Virginia Lee Salthouse, now Virginia Lee Salthouse Smith, plaintiff herein, born in the year 1913; Wirt C. Salthouse, Jr., defendant herein, born in the year 1915.

"9. Pearl Salthouse Finley, mother of the plaintiff herein, and Emma Lou Salthouse Broadway, defendant herein, had been friendly over a long period of years, and in 1925 or 1926 their respective husbands became acquainted, and from that time until the death of John T. Salthouse, in December, 1934, the Finleys and the Broadways visited back and forth from Salina to Wichita. During this time the estrangement continued to exist between Emma Lou Salthouse Broadway and her mother, Ida M. Salthouse, and prior to the death of John T. Salthouse, in December, 1934, she had not seen her mother, Ida M. Salthouse, for a year or more. During this same period of time, from 1925 or 1926, until December, 1934, Virginia Lee Salthouse, plaintiff herein, and Wirt C. Salthouse, Jr., defendant herein, either by themselves or with their parents, did at various times visit their Aunt Emma Lou Broadway, defendant herein, at her home in Wichita, Kan. At these respective times, although Virginia Lee Salthouse, plaintiff herein, now Virginia Lee Salthouse Smith, and Wirt C. Salthouse, defendant herein, expressed to their aunt, Emma Lou Broadway, a desire to also visit their grandmother, Ida M. Salthouse, they were dissuaded from doing so by Emma Lou Broadway. Emma Lou Broadway, on several occasions, told Virginia Lee Salthouse that her grandmother did not care for her and did not wish to see her, and also told Wirt C. Salthouse, Jr., that the grandmother did not like him and would not let him come in the house, even if he should go over to see her. Virginia Lee Salthouse, now Virginia Lee Salthouse Smith, plaintiff herein, wrote to her grandmother several times between 1926 and her death, and after Virginia Lee was married, in 1932, she received a letter from her grandmother, as well as a wedding present. Virginia Lee, at her wedding, wore the wedding dress of her grandmother, Ida M. Salthouse, having secured it from her at her home in Wichita, and several months after the wedding, Virginia Lee also visited her grandmother, Ida M. Salthouse. At the time of the funeral of John T. Salthouse, in December, 1934, Virginia Lee also saw and talked with her grandmother, Ida M. Salthouse, at which time she expressed her love for Virginia Lee and Wirt C. Salthouse, Jr., and her desire to know them better. It is apparent from the evidence in this case that the statements which Emma Lou Broadway, defendant herein, made to Virginia Lee Salthouse, now Virginia Lee Salthouse Smith, plaintiff herein, and Wirt C. Salthouse, defendant herein, to the effect that their grandmother did not care for them, or desire to see them, were untrue. In the summer of 1933 Emma Lou Broadway told Wirt C. Salthouse, Jr., that Ida M. Salthouse was only going to leave him and his sister Virginia Lee twenty-five hundred dollars apiece.

"12. On July 27, 1935, Ida M. Salthouse was removed from Wesley Hospital to St. Francis Hospital in Wichita, Kan. She was admitted to St. Francis

Hospital in a very weak, sick and emaciated condition, and after her admission she was treated by Dr. Carl Burkhead and Dr. Thor Jager. Dr. George Corrigan did not further attend the case. Her abdomen had again filled with fluid, and on August second or third she was tapped by Doctor Burkhead, and six or seven quarts of additional fluid was removed. She had an involuntary stool on August 4, 1935, and on the evening of the same day a special night nurse was employed. Ida M. Salthouse suffered considerable pain and discomfort, especially in the early morning of August fifth and sixth, and was apparently in a critical condition. From and after the date she was admitted to St. Francis Hospital, Ida M. Salthouse was administered medinal tablets daily and acetidine tablets three times a day. Medinal is a hypnotic and acetidine is something like an aspirin, but contains a sedative. The effect which either of these drugs would have upon a person's mental condition depends more or less upon the physical condition of such person. A person in a weakened physical condition requires less sedative to affect his mental capacity than one whose physical condition is normal. Ida M. Salthouse was in such a weakened and physically sick condition from and after August 4, 1935, until the time of her death, that the drugs administered to her during that period affected her mental capacity. During the last four or five days of her lifetime she was in a mental stupor and semiconscious condition, and she died on August 13, 1935, being at that time seventy-two or seventy-three years of age.

"13. John Lee Salthouse, for a long period of time, stood in a confidential relation with his mother, Ida M. Salthouse, and he played an active part in securing the preparing and signing of the purported codicil to her will. John Lee Salthouse took the original will of Ida M. Salthouse from the safety-deposit box which stood in their joint names, and was accessible to John Lee Salthouse at any time, to the office of the lawyer who drafted the purported codicil to said original will. John Lee Salthouse was present at the hospital at the time when the lawyer discussed with Ida M. Salthouse the proposed terms of the purported codicil and was present at the hospital at the time the purported codicil was signed.

"14. There existed between John Lee Salthouse and his sister, Emma Lou Broadway, controversies as to how their mother, Ida M. Salthouse, should dispose of her money and property and they, and each of them, discussed their differences in the presence of Ida M. Salthouse, representing to her that unless she made more liberal provisions to Emma Lou Broadway that there would be trouble about her estate after her death. This is apparent from the testimony of Dr. H. L. Salthouse, who related a conversation with John Lee Salthouse in which John Lee Salthouse stated that he and Emma had settled their business so that there would be no quarrel or trouble about it, and further that he, Emma and Mrs. Salthouse had compromised and settled their business up so that there would not be any trouble about it, it having been arranged that Emma Lou was to get so much, which was a good deal more than she expected, he having consented to give her whatever she wanted, and let it go at that.

"15. The purported codicil to the original will of Ida M. Salthouse, as hereinafter mentioned, was prepared by a lawyer who had never seen her until the day before the said purported codicil was signed. The said purported codicil

was witnessed by the lawyer who prepared the same and by another lawyer who had never seen Ida M. Salthouse prior to the time he witnessed the said codicil.

"18. That during the time Ida M. Salthouse was confined to Wesley and St. Francis Hospitals at Wichita, Kan., she was visited regularly by John Lee Salthouse and Emma Lou Salthouse Broadway, but neither of them at any time, either before or after the death of their mother, notified or advised Virginia Lee Salthouse Smith, Wirt C. Salthouse, Jr., or Mr. or Mrs. Finley of the illness or of the death or of the funeral of Ida M. Salthouse, and Virginia Lee Salthouse Smith learned of her grandmother's death through a newspaper clipping about her estate which had been filed for probate six days after her death.

"20. John Lee Salthouse, several months after the death of his mother, refused to talk with his niece, Virginia Lee Salthouse Smith, plaintiff herein, regarding the change which his mother had made in her will by the purported codicil.

"21. On August 6, 1935, at the time of the execution of the purported codicil to the last will and testament of Ida M. Salthouse, deceased, the said Ida M. Salthouse did not have sufficient mental capacity to know or understand the objects of her bounty, to know or understand the nature and extent of her property and to know or understand the disposition which she purported to make thereof by such purported codicil to her last will and testament.

"22. At the time of the signing by said Ida M. Salthouse of such purported codicil to her last will and testament, her execution of such instrument was made under fraud, undue influence and restraint, exercised upon her by John Lee Salthouse and Emma Lou Salthouse Broadway. That said decedent, Ida M. Salthouse, executed said purported codicil to her last will and testament on August 6, 1935, in order to secure to her peace of mind and to avoid further controversy between John Lee Salthouse and Emma Lou Salthouse Broadway, and said decedent, over the disposition of her property upon her death.

"The court makes the foregoing findings from all the evidence in the case, the answers to the questions submitted to the jury, which are adopted by the court, and in particular, findings numbered nine, ten, thirteen, fourteen, fifteen, eighteen and twenty, hereinbefore made.

### "Conclusions of Law

"That said purported codicil, executed August 6, 1935, by the said Ida M. Salthouse, now deceased, is null and void and should be set aside and the probate thereof revoked, annulled and held for naught, and that the instrument dated August 14, 1922, executed by Ida M. Salthouse, heretofore admitted to probate in the probate court of Sedgwick county, Kansas, as the last will and testament of said Ida M. Salthouse, deceased, should be adjudged and decreed to be the valid last will and testament of said decedent."

Judgment was entered for plaintiff. Defendant's motion for a new trial was overruled, and this appeal was taken.

Was there substantial evidence to support the findings and judgment that the testatrix, Ida M. Salthouse, did not have testamentary capacity to execute the codicil on August 6, 1935?

Defendants contend there was no competent evidence that the testatrix was mentally incompetent, and that there was no competent evidence of undue influence.

The original will of Ida M. Salthouse, executed in 1922, bequeathed to her son, John Lee Salthouse, $50,000, and to her daughter, Emma Lou Broadway, $5,000. To her grandchildren, Wirt and Virginia Lee, she bequeathed the sum of $10,000 each. The codicil increased the gift to her daughter Emma Lou to $25,000, and reduced the legacies to her grandchildren Wirt and Virginia Lee to $2,500 each. This radical change in the will was accompanied by a forfeiture clause as to any beneficiary who attempted to defeat the will or codicil.

The testimony tended to show that the testatrix at the date she signed the codicil was 72 or 73 years of age. In the year 1928 the testatrix underwent an operation for goiter; in the year 1933 or 1934 she underwent an operation for cataracts of the eye; and during the early part of July, 1935, she consulted Doctor Corrigan about her condition which subsequently caused her death. She was sent to Wesley Hospital, Wichita, on July 15, where she was confined until July 27. Her condition was diagnosed as a cancer of the abdomen of a progressive nature. It was realized that there was no cure for her condition and the only treatments she had were to allay the pain and discomfort and to stay the effects of the disease as long as possible. During the time that she was confined to Wesley Hospital she was administered daily either phenobarbital, luminal or codeine, and sometimes all of them. These are well-known drugs, all of them having sedative effects. There is no positive evidence that while she remained in Wesley Hospital her mind was affected. However, the inference is that she rapidly grew worse, inasmuch as Doctor Corrigan was dropped from the case, and she was removed by ambulance to the St. Francis Hospital on July 27, 1935, and new doctors procured. At that time she was in a weakened condition, with a general appearance of anemia and emaciation. Her chest was not normal and her heart was irregularly timed. By August 2 her abdomen was filled with fluid, although it had been previously drained while she was at Wesley Hospital. On this date Doctor Burkhead drew six or seven quarts of fluid from her abdomen. On the evening of August 4, at 8:30 o'clock, a special nurse was employed and went on duty and remained to care for Ida M. Salthouse until she died. On the same evening, at about 10 o'clock, Ida M.

Salthouse had an involuntary stool, from which fact an inference can be drawn that at least at that time her mind was not fully co-ordinating with her physical demands, inasmuch as she did not ask for a bedpan.

From July 27 until the time of her death on August 13 Ida M. Salthouse was given daily medinal tablets and acetidine tablets. Both of these tablets contain sedatives and will affect a person's mind if given in large doses, or if given in average doses to a person who is physically weakened or seriously ill. There is little doubt from the evidence but that Ida M. Salthouse's condition had reached the point on August 6 where even a small dose of either of these tablets would have affected her mind.

The witness Cochran, a man of wide experience in the field of handwriting, and fully qualified as a handwriting expert, in which connection he had studied the relationship between the mind and the handwriting of individuals, testified there were various abnormalities appearing in the signatures of the testatrix to the codicil, as well as to the deeds and bill of sale; that in his opinion such abnormalities indicated a profound mental disturbance, and showed the writer had an erratic mind at the time.

On the question of fraud and undue influence, much evidence was placed in the record. The testatrix was very fond of her son Wirt C. Salthouse; she was greatly grieved over his death, and stated on various occasions that she would see that his children would be taken care of and would receive her assistance. After the divorce between John T. Salthouse and Ida M. Salthouse in 1917, the son John L. Salthouse favored his mother, thereafter living with her and never having further relations with his father. Testatrix distrusted her daughter Emma Lou. Mrs. Guyman, who had known Ida M. Salthouse for forty years, visited the testatrix in 1934. In a conversation had at that time the witness stated that the testatrix told her that Emma Lou was deceitful and dishonest; that the testatrix and John both told her that Emma Lou was dishonest and deceitful and that they had to lock the doors to keep her from coming into their home; that she was locked out because she stole money and articles of linen, and that she had been caught stealing pillowcases.

The son, John Lee Salthouse, was active in the preparations leading to the execution of the codicil. He secured the original will from his mother's safety-deposit box in the bank and took it to the office of the attorney, and he was at the hospital when the codicil was

being considered and when it was signed. Both the son, John Lee, and the daughter, Emma Lou, visited their mother regularly at the hospital during her last illness.

The attending physician, Doctor Burkhead, was not advised that Ida M. Salthouse had signed a codicil, nor was the special nurse, Mary Krier, informed of this fact. None of the witnesses who testified that they were friends of Ida M. Salthouse knew that she had signed a codicil, and obviously they were not asked by her to be witnesses to the same. Clara Guyman, a friend for years of the testatrix, was not told of her serious illness until after her death. Although Emma Lou Broadway knew where the Finleys, the plaintiff and her brother lived in Salina, Kan., neither she nor her brother, John Lee, made any effort to advise the plaintiff, plaintiff's brother, plaintiff's mother, or plaintiff's stepfather of the fact that Ida M. Salthouse was seriously ill, of her death or even of her funeral. The plaintiff, her brother, mother and stepfather learned of the illness, the codicil, the death and funeral from sources independent of either John Lee Salthouse or Emma Lou Broadway.

As the findings of fact by the court above set out the evidence in detail, it is unnecessary to burden this record with further particularity.

In the recent case of *Gilpin v. Burch*, 145 Kan. 224, 65 P. 2d 308, this court said:

"This is a fact case in which there was a conflict in the evidence on both of the questions involved, as to the deceased possessing testamentary capacity on July 18, 1933, when he signed the will, and as to his being unduly influenced in the preparation and execution of the will. In such a case the only duty or authority of a court of appeals is to determine from the conflicting evidence and the inferences to be drawn therefrom whether or not there was sufficient competent evidence to support the findings of the trial court. We think there was, and therefore such findings are conclusive." (p. 230.)

After quoting from *Randall v. Bird*, 118 Kan. 341, 235 Pac. 103; *Bruington v. Wagoner*, 100 Kan. 439, 164 Pac. 1057; *Bell v. Van-Meter*, 133 Kan. 236, 299 Pac. 606; *Bradley v. Hill*, 141 Kan. 602, 42 P. 2d 580; *Stewart v. Marker*, 143 Kan. 860, 57 P. 2d 75; *Gorman v. Hickey*, 145 Kan. 54, 64 P. 2d 587, the court continued:

"Most of these cases discuss the questions of testamentary capacity and undue influence, and some of them consider the inferences to be drawn as to the latter from the conflicting testimony. We have attempted to apply the reasoning mentioned in these and other cases to the evidence, and all the reasonable inferences applicable to the very voluminous evidence in the case at bar, and we feel very much as expressed in the last case above cited, that

if a contrary judgment had been reached by the trial court, giving the other evidence superior weight and credence, this court would have had no difficulty in following its usual appellate practice." (p. 231.)

Following the rule so announced, we have examined the record in this case and we think there was sufficient competent testimony to support the findings of the advisory jury and the findings of the trial court.

It is urged that the trial court committed error in permitting the witness Cochran, who had qualified as a handwriting expert, to testify that in his opinion the abnormalities in the signature of the testatrix showed there was a profound mental disturbance of some kind on that date.

In *Gibbons v. Redmond,* 142 Kan. 417, 49 P. 2d 1035, a handwriting expert was permitted to testify that the signature of the will indicated the testator was in a state of mental exhilaration when the will was signed, and that the omission from the signature of part of the testator's name indicated a mental lapse at that point. It was there said: "What weight should ultimately be given the testimony was a matter for the trial court to determine."

In *Baird v. Shaffer,* 101 Kan. 585, 168 Pac. 836, it was said:

"The testimony of attesting witnesses to a will may be overcome by any competent evidence. (*Ginter v. Ginter,* 79 Kan. 721, 738, syl., par. 5, 101 Pac. 634; 2 Wigmore on Evidence, sections 886, 1514.) Such evidence may be direct or it may be circumstantial; and expert and opinion evidence is just as competent as any other evidence. Indeed, where the signature to a will is a forgery and where the attesting witnesses have the hardihood to commit perjury, it is difficult to see how the bogus will can be overthrown except by expert and competent opinion evidence tending to show that the pretended signature is not that of the testator but spurious." (p. 587.)

We think the testimony of the handwriting expert was admissible under the rule announced in the Gibbons case. The weight to be given this testimony was for the trial court to determine.

The contention is made that in the trial of this case, over the objections of the defendants, the court admitted a mass of evidence as to the family relations of the Salthouse family; that such evidence was too remote and had no probative value as to the real issues in the controversy. Objection is made as to statements and declarations of testatrix which were admitted showing the state of her affections for her daughter Emma Lou and her grandchildren.

These questions were considered by this court in *Mooney v. Olsen,* 22 Kan. 69. We quote a part of the syllabus:

"1. While the declarations of a testator, either before or after the execution of his will, are as evidence of external facts stated, whether in support or impeachment of the will, mere hearsay and inadmissible, yet wherever the mental condition of the testator is a subject of inquiry, his statements and declarations are competent evidence thereof. Therefore, where a will is charged to have been executed through undue influence, and the circumstances surrounding the execution tend to show weakness and debility on the part of the testatrix, and the presence and active assistance of the principal devisees, *held*, that it is competent to show that for years prior there had been estrangement and ill-will between the testatrix and one of such devisees, and as evidence of such estrangement and ill-will, to introduce her statements and declarations.

"2. In an action to contest a will on the ground of undue influence, a wider range of inquiry exists than in ordinary litigation. The contents of the will, the extent of the testator's estate, his family and connections, the terms upon which he stood with them, and the claims of particular individuals, the condition and relative situation of the legatees or devisees named, the situation of the testator himself, and the circumstances under which the will was made, are all proper to be shown."

See, also, 3 Wigmore on Evidence, section 1738.

We think there was no reversible error in the admission of this testimony.

Finally it is urged that the court committed reversible error with respect to findings of fact and conclusions of law. The advisory jury answered the special questions on March 24, 1937. The defendants filed motions to set aside the special findings of the jury, for a new trial and for judgment; the plaintiff filed a motion for the court to adopt the findings of the jury and to render judgment. On April 6, 1937, the motions were presented to the court, and were argued by counsel, and defendants introduced evidence in support of their motion for a new trial. The court overruled defendants' motions, and sustained the motion of the plaintiff.

On April 18, 1937, defendants filed new motions for a new trial and to set aside the findings. Counsel for each of the parties had prepared formal journal entries, but being unable to agree went before the court on May 14, 1937, to discuss the matter of a formal journal entry. Counsel for plaintiff submitted a journal entry which set forth the jury's special findings, but which included additional findings of fact. These additional findings of fact were objected to by defendants, but, after argument, were adopted by the court.

Defendants' motion for a new trial and to set aside the findings were by the court overruled on July 10, 1937, and during the April term of court. Defendants contend that the special findings of the

jury, which the court approved and adopted on April 6, could not thereafter be added to by other findings of fact.

From the foregoing statement it appears that additional findings were made, not only while the motion for a new trial was pending, but during the same term of court. In *Walsh v. Hill,* 121 Kan. 246, 446 Pac. 997, it was held that additional findings made after the term at which the judgment was rendered, but while a motion for a new trial was pending, did not constitute reversible error. (See, also, *Harrison v. Lyon,* 126 Kan. 705, 271 Pac. 395; *Nordman v. Johnson,* 94 Kan. 409, 146 Pac. 1125; *Nordman v. Nordmark,* 100 Kan. 522, 164 Pac. 1062.) We think the contention of defendants is without merit.

The judgment is affirmed.