No. 40,414

In the Matter of the Estate of Margaret Olive Eyman, Deceased. (JOSEPH H. EYMAN, MAURINE MARGARET MEIER, MAYNARD MORRIS, and KATHERYN S. TARWATER, Guardian *Ad Litem* for HAZEL CRANER, an Incompetent Person, *Appellants,* v. MAMIE E. HOWARD, *Appellee.* )

(309 P. 2d 664)

Opinion filed April 6, 1957.

*Laurence M. Turner,* of Moline, and *Katheryn S. Tarwater,* of Howard, argued the cause; and *Darrel H. Vinette,* of Howard, was with them on the briefs for appellants.

*R. O. Robbins,* of Sedan, argued the cause; and *Noel Mullendore,* of Howard, was with him on the briefs for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from an order in the lower court admitting a will to probate wherein appellants seek to have the will denied probate on the ground that undue influence was exerted upon the testatrix by the petitioner.

The appellee, Mamie E. Howard, after the death of her mother, Margaret Olive Eyman, petitioned the probate court for the admission of her mother's will to probate. The petition named all of the heirs as follows: Mamie E. Howard, a daughter, Hazel Craner, a daughter, Joseph Harvey Eyman, a son, Margaret Meier, a granddaughter, and Maynard Morris, a grandson (the latter two being the surviving children of a prior deceased daughter). All except the petitioner objected to the admission of the will to probate on the ground that the will was executed by reason of undue influence exerted upon the testatrix by Mamie E. Howard. The probate court denied probate and upon appeal to the district court the will was admitted to probate after full hearing.

After the usual provisions the will disposed of the decedent's property in the following manner: To Margaret Meier, $100.00; To Maynard Morris, $1.00; To Joseph Harvey Eyman, "my" King Solomon Temple rug and an unimproved eighty acres; To Mamie E. Howard, an improved eighty acres together with all household furniture and effects except the King Solomon Temple rug; To Lura Cole, $300.00, to be deducted from the bequest of Joseph Harvey Eyman; and the residue to Joseph Harvey Eyman, Mamie E. Howard and Hazel Craner, in equal shares. That portion given to Hazel Craner was then set up in trust naming Mamie E. Howard trustee to serve without bond. Mamie was also named executrix, to serve without bond.

Hazel Craner, an incompetent person, is confined to an institution in the state of Colorado. She is represented by Katheryn S. Tarwater as guardian *ad litem.*

The appellants contend (1) That the alleged will was not executed according to law; (2) That the testatrix was not mentally competent to make a will on June 12, 1954, the date of the execution of the alleged will; and (3) That the terms of the will did not reflect the true desires and wishes of the testatrix, but were the results of undue influence exercised by her daughter, Mamie E.

Howard. While appellants admit in argument that the decedent was not an incompetent person on the date of the execution of the will, they contend she was so physically weakened and seriously ill that when coupled with the use of sedatives for medication her mental capacity was such that she was easily influenced. Their primary contention is that the alleged will was drawn under undue influence.

The evidence disclosed that Margaret Olive Eyman died on the 22nd day of June, 1954, at Independence, Kansas, a resident of Elk county, only ten days after making the alleged will, never having left the hospital at Independence, Kansas, after her admission on the 20th day of May, 1954. Dr. Porter M. Clark, an M. D., first saw the decedent in December, 1951, and treated her at the hospital in Independence early in the year 1952. Dr. Clark talked to her at that time, stating to her in effect that she was a sick woman and ought "to get her house in order." The decedent inquired as to whether she was about to die, and upon being informed to the contrary, stated "if I'm not going to die, I'm not going to make a will." Dr. Clark indicated that it came to his attention that the decedent had a hard time getting along with her family.

Dr. Clark again saw the decedent about a year later and again not long before her death on the 20th day of May, 1954, when she was admitted to the hospital. He then administered dilaudid, a narcotic which represses fear and anxiety, allows the patient to breathe easier and relieves hunger. On the evening of the same day which the testarix entered the hospital, morphine was administered to her but not more dilaudid. Thereafter, an eighth of a grain of morphine was administered daily as required by the patient until her death, which was caused by congestive heart failure.

On the 21st day of May, 1954, the decedent seemed worried and discussed her illness with Dr. Clark, who advised her that she should take care of her business, and that in all probability she was confined with her terminal illness. The decedent then asked Dr. Clark who could make a will for her. The doctor declined to recommend any particular attorney, but after the decedent suggested one, she related to the doctor that she did not want to use him because she was dissatisfied with the way he had handled a certain matter. The decedent then suggested another attorney, O. L. O'Brien, of Independence, Kansas.

Mamie E. Howard, the only close relative who lived near the decedent and helped her with her private affairs, then consulted with Mr. O'Brien at his home. She informed him that her mother wanted to make a will but that she did not know what provisions her mother desired to put in the will.

Prior to the second visit of Mamie with Mr. O'Brien, the attorney himself visited Dr. Clark and asked him whether or not the decedent was mentally competent to make a will. The doctor informed Mr. O'Brien that in his opinion she was competent, but that she was a very sick woman. When Mamie called at the office of Mr. O'Brien on her second visit, she related that she had talked to Dr. Clark and her mother, and that her mother wanted Mr. O'Brien to come out and prepare a will for her. Mr. O'Brien asked Mamie if she had any idea what her mother wanted to do and she said she really didn't know, except that she had a general idea of it. The attorney then asked for Mamie's idea about it and then prepared a rough draft of the will incorporating some of his own ideas into the will, particularly concerning a trust for Hazel Craner, the decedent's incompetent daughter.

On the 11th day of June, 1954, Mr. O'Brien met at the hospital with Dr. Clark where they together went to the room of the decedent. Mamie Howard was also present in the room. The decedent then related to Mr. O'Brien that she had been thinking about making a will and that Dr. Clark had told her that she was very sick. Decedent further related that she thought she ought to make a will and that it was important that she make a will because of the family situation. She commented that her daughter in Colorado, adjudicated incompetent, was her main problem. She did not want the state of Colorado to gobble up what she left to her for her care and hospital expense. She wanted to know if she could make a will to do something about that. Mr. O'Brien then read the provisions of the rough draft prepared to the decedent, and the following is his testimony on this point:

"This is the one I had drafted, . . . and when I read that clause to her about giving the hundred dollars to the one Margaret and one dollar to Maynard, why she wanted to know if that would hold. She said she didn't want them to have any more than that because she said they hadn't done anything for her, . . . and then the next thing that she stopped me at as I read it on down is this paragraph (c), 'To my grandson Allan Howard, I given my Buick automobile.' She said, . . . 'I don't want to give him the car. I think he has got a car', . . . I said 'Give me an idea how

you want it . . .' And so she thought about that quite a little while and discussed it and finally she, I think she spoke to Mrs. Howard about it, too, and Mrs. Howard told her it was up to her, whatever she wanted to do with it, so . . . we wound up by just leaving that, . . . in the estate. . . . that was her decision, . . . and then the next clause was 'To my son Joseph Harvey Eyman, I give, grant, devise and bequeath' this tract of land, and she said, 'Is that description right in there?' Part of it had some improvements on it and the other didn't, and she was giving him the part that didn't have any improvements, and she questioned whether we had given him the part that didn't have the improvements. That's the way she wanted it, and so she and Mrs. Howard talked about that and they decided that the way I had it in there was right at any rate we had a discussion about that.

"And then in the next clause (e) I read that, 'To my daughter Mamie E. Howard, I give, grant, devise and bequeath the E¼ of the SE¼ 9-31-10 . . . together with all household effects . . . together with all household furniture and effects and all personal effects . . .' and she said, 'Well, that isn't—that's giving it all to Mamie, isn't it?' And I said, 'Yes.' She said, 'I don't think that's right.' And then she said, 'I have to think of all of them, remember. And I said, 'Well, that's as you should, whatever you want to do. Do you want to divide the household furniture up?' And she said, 'Well, I want to give him [Joseph Harvey Eyman, her son] something.' She thought about it and said she had a nice rug there that she would give him the rug. So, when I redrew the will, of course, I redrew it accordingly.

"Q. She told you what kind of a rug it was?

"A. Yes, it was a King Solomon's Temple rug. . . . And then (f) in this original will that I had drawn, she gave $100.00 to Laura Cole; and then she also gave her $300.00 '. . . which amount shall be deducted from the bequest to my son Joseph Harvey Eyman . . .' and she said 'I don't want to give her $100.00. Why should I give her $100.00? . . .' She said 'I want to give her $300.00 . . .' which her son Joe, I believe she called him, which he had agreed to pay her when they were divorced. . . . And then this clause . . . this 4—'That portion of my estate given and bequested to my daughter Hazel Craner shall be held in trust by . . . Mamie Howard . . .' And use for the benefit of this daughter. Of course that language in there is mine. It was designed to do what she wanted to do, that is to see that she would get the use of it, but not to enable the State to take it, . . . She wanted to know if that would be effective, and I told her that was the only way I knew to do it, to carry our her desires. . . .

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"One other thing that I remember she said something about;. . . . her hospital bill and so forth and said she was sick there and said she had an account . . . in some bank, I don't remember, probably Moline, . . . she said she had put that in a joint acount with Mrs. Howard so she could draw the money out to pay expenses with. I don't think I was given any idea what it amounted to or anything, but I remember that she discussed that, so I told her goodbye and I would see her the next day. . . ."

The substance of this testimony was confirmed by Dr. Clark.

The next day at 11:00 o'clock a. m., June 12, 1954, Mr. O'Brien, after having re-drafted the will, again met at the hospital this time with Dr. Bair, who was in charge of the patient in the absence of Dr. Clark. Dr. Bair and Mr. O'Brien went to the room of the decedent. Mamie E. Howard was also present in the room with the decedent at this time. Mr. O'Brien then read the will to the decedent, paragraph by paragraph, and explained where the changes were made. He then testified:

"She said that was the way she wanted it. I remember she again reiterated about these grandchildren. She wanted to be absolutely certain that they couldn't come in and get more than that because they weren't entitled to anything, and I also remember that she particularly discussed this daughter in Colorado. She was very anxious that this money be kept so that it could be used for her benefit . . . Then I think I called to her attention to . . . other changes in the will that were made, . . . and we discussed them. I remember the one about the automobile. We left that out entirely. . . . Now, she wanted to know what become of it and I told her that if they didn't agree on it it would probably have to be sold and divided up, and that's—she went all over the will and read it all over and asked questions about it and finally said that's the way she wanted it and she was ready to sign it."

Dr. Bair and Mr. O'Brien then witnessed the decedent place her signature on the will, and the will was executed in accordance with the formal requirements of the law. The evidence disclosed that the decedent put her glasses on, looked the will over and signed it, and there was some jesting about how well she signed her name in bed and about the remarkably firm signature, to which the decedent responded that she had been a pretty good scribe but she wondered she could write as well as she could.

Both Dr. Clark and Dr. Bair testified that the decedent, Margaret Olive Eyman, was rational at all times and was mentally competent to make a will. When Dr. Clark returned to the hospital on the 21st day of June, 1954, following his absence from June 11th, he and the decedent discussed many things and among them she said "Well, I made it." Then Dr. Clark said "What did you make?" and she said "The will and Dr. Bair witnessed it."

The foregoing is the substance of the direct evidence in support of the admission of the will to probate.

The appellants produced no direct evidence to show that Mamie E. Howard exerted undue influence over her mother concerning the

execution of the will. They do, however, point out the following facts which are direct evidence and tend to favor their contention:

That while Margaret Olive Eyman was confined in the hospital she was under the influence of sedatives, and that she had become both physically and mentally weak in spite of the fact that she was a woman of strong will and determination; that during the course of her hospitalization she was unable to keep more than one meal per day down, and that she lost the others by reason of her nauseated condition. The appellants emphasize that Dr. Porter M. Clark on a number of different occasions suggested that the decedent should get her house in order. Dr. Clark, however, stated that he was referring to her spiritual preparedness and not necessarily her property.

Other circumstantial facts which tend to substantiate the appellants' position that undue influence was exerted are:

That on the 31st day of May, 1954, two checks were written bearing the signature of the decedent, otherwise written in the handwriting of Mrs. Howard, payable to the order of Mamie E. Howard, one for $1,100.00 and one for $1,500.00, each containing the notation "For material and services"; that twelve days later Mrs. Howard instructed Mr. O'Brien what to put in the will in its first draft; that thereafter on the 22nd day of June, 1954, there appeared an instrument in the handwriting of Mrs. Howard above the signature of decedent requesting the Exchange State Bank to make the bank account joint between the decedent and Mrs. Howard. This document was dated June 19, 1954, which was less than seventy-two hours before the death of Mrs. Eyman and after thirty days of continuous daily morphine injections. On the day of Mrs. Eyman's death, the 22nd of June, 1954, Mrs. Howard cashed the two checks, both dated May 31, 1954, for $1,100.00 and $1,500.00 respectively. She immediately thereafter secured the bank statement. The cashier, H. L. Johnson, testified that by the early part of August, 1954, the bank account had been reduced from $4,304.65 to $220.31. According to the evidence the majority of this sum withdrawn from the bank went for unexplained uses.

After the funeral of the decedent, Mamie E. Howard stated to her brother "Let us hope there is a will." She expressed a certain degree of surprise in a letter to her brother on receipt of notice of the will from some "lawyers in Independence" without naming them. Mamie then misquoted the will when she wrote to her

brother on the 16th day of July, 1954, wherein she said the will left "you half the land with the rich oil pools under it and about one fourth each on the other half to Hazel and me."

The appellants produced a witness named Viola Eyman, wife of Joseph H. Eyman, who visited the decedent at the hospital on June 14, 1954. She testified that the decedent was not keen and alert as usual and that the decedent complained "She said that she sure didn't see why she owed Pat any $100.00, that they wanted her to give Pat the car." She further testified that she heard Mrs. Eyman say to her husband, Joe, in discussing the will "Oh, I just signed it to get rid of them, I was so tired." She further quoted the decedent as saying "Mamie sure has been mean to me, she stays across the hall all the time." She further said "I hear her voice over there now." The witness then testified that she and her husband went across the hall and there was a room full of colored people.

Ina Jualian, a niece of the decedent, who frequently visited in her home, quoted the decedent as saying "Ina, I am not going to make a will. I know the kids are going to fight over this, but just let them fight."

Nora Sheel, a niece of the decedent, frequently visited in her home, and testified that the decedent always said she never would make a will.

Audrey Moore, a next-door neighbor to Nora Sheel, saw the decedent frequently at the home of Mrs. Sheel. On the 12th day of June, 1954, the witness was in Independence and visited the decedent at the hospital. She testified that the decedent did not know her.

On the 29th day of October, 1955, the district court of Elk county found that Margaret Olive Eyman executed an instrument purporting to be her last will and testament and that the same was duly and properly executed, published and declared to be her last will and testament in the manner provided for by the laws of the state of Kansas. The court further found that at the time of the execution of said instrument, said Margaret Olive Eyman was of full age, of sound mind and not under any restraint or undue influence whatsoever and the said instrument was in fact and truth the last will and testament of Margaret Olive Eyman, deceased, and should be admitted to probate.

The law in Kansas concerning the validity of a will under attack

upon the ground that undue influence was exerted has become well established. The decisions cited in this opinion together with the authorities cited in them are almost exhaustive on the subject in Kansas. No purpose would be served to burden this opinion with an extended review. Many cases are discussed in *Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634, where the court said:

"To destroy the validity of a will undue influence must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own. It must be brought to bear directly upon the testamentary act, and particular parties must be benefited or disfavored as the result of the purpose and pressure of the dominating mind."

It was said in the case of *In re Estate of Smith,* 168 Kan. 210, 212 P. 2d 322:

"Legitimate influence has never been regarded as improper. It is malign influence resulting from fear, coercion or any other cause which deprives a testator of his free agency in the disposition of his property that the law condemns."

(See, 1 Bartlett's Probate Law and Practice, [Rev. Ed.], § 867, p. 430; and *In re Estate of Hall,* 165 Kan. 465, 195 P. 2d 612.)

The question of undue influence is peculiar in character and does not arise until after the death of the decedent, who alone fully knows the influences which have been brought to bear; the undue influence does not usually enter the formal execution of the instrument but lurks in the remote processes of the mind, thus the courts have permitted a wider range of inquiry than in ordinary litigation. (*Mooney v. Olsen,* 22 Kan. 69, 75.) In this connection, evidence concerning sedatives which were administered to the patient and the manner in which they affect the mind, as distinguished from one whose physical condition is normal, is proper. (*Gilpin v. Burch,* 145 Kan. 224, 65 P. 2d 308; and *Smith v. Salthouse,* 147 Kan. 354, 76 P. 2d 836, 57 Am. Jur., Wills, § 94, p. 101.)

This case was fully tried in the lower court with all these legal principles fully understood by the court and parties litigant. The burden of proof is upon the parties attacking the will of a person of sound mind on the ground of undue influence. All that is necessary is that the evidence produced shall preponderate over the evidence adduced and the presumptions prevailing on behalf of the proponent of the will. In making proof the parties attacking the will are not limited to the bare facts which they may be able to adduce, but they are entitled to the benefit of all inferences which

may be legitimately derived from the established facts. (*Ginter v. Ginter,* supra; *Colvin v. Colvin,* 128 Kan. 691, 280 Pac. 763; and *In re Estate of Harris,* 166 Kan. 368, 374, 201 P. 2d 1062.)

In *Colvin v. Colvin,* supra, under circumstances somewhat similar to those involved in the present case, the jury heard the testimony, saw the witnesses and *found that undue influence was exercised* over the decedent in the execution of the will, and this court in reviewing the evidence held that on appeal their only function was *to determine whether or not there was sufficient evidence to support such a finding.*

The law controlling our decision in this case is set forth in *Gilpin v. Burch,* supra, where syllabus one reads:

"In an action to contest a will because the testator was unduly influenced in the preparation and execution thereof and because he lacked testamentary capacity when it was executed, where the trial court found from conflicting testimony that the testator was not under any mental restraint or undue influence and that he possessed mental capacity to execute a will and understood and knew the nature and quality of his act, including the extent of his property and the natural recipients of his bounty, and such findings are sustained by sufficient competent and substantial evidence, the findings are conclusive on appeal."

From an examination of the record in its entirety, and careful consideration of all arguments advanced in support of the contentions entitled to appellate review, we are convinced this is primarily a fact case where the basic complaint is that the appellants' evidence, and not the appellee's, should have been accepted by the trial court. On many occasions a reading of the cold printed record would seem to lead to a conclusion different from that found by the trier of the facts. It may be added that if it were our province to weigh the evidence and pass upon the facts, we might be impressed by the evidence and arguments advanced by the appellants with respect thereto. That, however, is not the test. As it is, since the trial court resolved those facts against the appellants upon controverted but nevertheless substantial competent evidence, our duty is to uphold the judgment and it is so ordered.

The judgment is affirmed.