No. 32,341

THOMAS J. GIBBONS et al., *Appellees*, v. OWEN J. REDMOND et al., *Appellants*.

(49 P. 2d 1035)

Opinion filed October 5, 1935.

*Robert C. Foulston, George Siefkin, Sidney L. Foulston, Lester L. Morris, George B. Powers, Carl T. Smith, C. H. Morris, Mark H. Adams, Howard L. Baker* and *Charles E. Jones,* all of Wichita, for the appellants.

*W. D. Jochems, J. Wirth Sargent* and *Emmet A. Blaes,* all of Wichita, for the appellees.

The opinion of the court was delivered by

BURCH, C. J.: The action was one to contest a will on the ground of mental incapacity of the testator. The district court set aside the will, and those interested in sustaining it appealed.

The will was that of Thomas McDonald, a bachelor, approximately sixty-six years old. He was the son of Patrick McDonald and wife, and had a half sister, born of the same mother but not the same father. The plaintiffs are children of the half sister, nephews and nieces of the testator, and his sole heirs at law. They were given $5 each by the will. The defendants are the beneficiaries under the will, and the executor. The beneficiaries are strangers to the blood of the testator. They are children of Christopher and Mary E. Redmond, who were close friends of the testator and his

father and mother. The will provided that all the testator's property, real and personal, should be converted into money and the money should be divided equally among these children.

On March 4, 1933, the testator suffered a cerebral hemorrhage, resulting in partial paralysis of one side of his body. The next day he was taken to a hospital, where he remained until April 15, when he died. The will was executed at the hospital on March 23. It is conceded by defendants that while the testator was at the hospital he was at times irrational. It is conceded by plaintiffs that he was at times rational. Therefore the question was whether the testator possessed sufficient mental capacity to make the will at the time it was executed. That does not mean that no evidence could be considered except such as immediately related to the time the testator had the pencil with which the will was signed, in his hand. No such attitude was assumed at the trial, and the testimony took a wide range.

Defendants' principal contentions are these:

"First: All the substantial evidence in this case conclusively shows that the testator, Thomas McDonald, had testamentary capacity at the time he executed his will.

"Conversely, there is no substantial or convincing evidence to sustain the finding of the trial court that the testator did not have testamentary capacity at the time he executed his will."

These propositions serve as a basis for an argument which should have been, and doubtless was, addressed to the trial court. The rules relating to consideration on appeal of credibility of witnesses, of weight of evidence, of conflicts of evidence, and of differing inferences from evidence, are well known, and the court does not propose to review the evidence. Some observations will be made which will serve primarily to develop a question of law relating to admissibility of testimony, and the observations will be extended to include some other evidence relating to the testator's mental condition.

Beginning with the very time the will was executed, the name of the testator was not written at the end of the will. Instead of that, the testator produced a grandiosity, of which the following is a reproduction:

Usual signatures of the testator were in evidence. None had an extreme height of more than five-eighths of an inch, and what appears at the end of the will does not disclose a single characteristic of the testator's usual signature, unless it be speed. There was no finger movement in making the signature, but anybody can see the pencil was firmly held and the flourishes were produced by free arm movement, without tremor, and without awkwardness.

All the testator's ordinary signatures were written "Thos McDonald." No witness for defendants came forward to say he could find "Thos," or "Thomas," or "McDonald" in the lines, or tell where given name left off and surname commenced. A qualified handwriting expert testified for plaintiffs that the abbreviation "Mc" is entirely absent from the lines, and that there was no indication of any effort to produce the "Mc" portion of the writer's name. There was no testimony that "Mc" could be found in the lines. There was expert testimony admitted over objection, disparaging to the testator's competency, based in part on the signature itself.

Before discussing admissibility of the expert testimony just referred to, something may be added bearing on the subject of the testator's mental condition when the will was executed.

The will was signed at about 5:30 in the afternoon of March 23, and was prepared for signature pursuant to conversation between the testator and the scrivener on that day. The will contains no description of the testator's property, which consisted of numerous items of both real and personal property, and there was no testimony the testator discussed with the scrivener the composition and extent of his estate. The will contains no name of any nephew or niece, and there was no testimony the testator named any disinherited heir. After the will was signed, the scrivener made independent inquiry concerning who the nephews and nieces were. The will does contain the names of the Redmond children. The scrivener did not learn these names from the testator, but resorted to independent inquiry to ascertain them.

On Sunday, March 19, the testator, conversing with a friend, W. E. Phifer, who was visiting him at the hospital, indicated he thought he was down in Mexico, down on the Gulf of Mexico. Similar statements were made when Phifer subsequently visited the testator.

A few months before his stroke the testator had discussed his business affairs with Phifer in considerable detail; discussed the subject of making wills; mentioned some estates disposed of by will to other than relatives, over which trouble had arisen; said it was foolish for a man to leave his property to persons not blood relatives; and said he was going to leave his property to his nephews and nieces. Phifer had no interest in the controversy and testified the testator was out of his mind on March 19.

On March 20 or March 21 the testator was visited at the hospital by J. M. Kessler, who testified:

"He said he had just got back from Mexico, selling real estate. He said he had been selling some down on the Gulf of Mexico. He says, 'You can see —.' He says, 'See the water out there?' He says, 'We are selling lots right out there in that water,' and he says, 'They are buying them.' I was there about half an hour. He jumped from one subject to another."

Kessler expressed the opinion the testator was "crazy."

When the testator had his stroke, he was at C. O. Swenson's room. Swenson helped him home, put him to bed, stayed all night with him, and finally persuaded him to call a doctor. Swenson saw the testator

several times at the hospital. Swenson testified that several days before the will was made the testator's mental condition was very poor.

On March 22 Phifer visited the testator at the hospital. Phifer testified:

"He had it in his head they were sort of persecuting him at the hospital. He said if somebody didn't get him out of there they were going to kill him. He asked me if I would get him out of the hospital. I told him I couldn't. He said, 'You can get me out if you try,' and I said, 'Well, if I could, I would sure get you out, but I believe the only person that can get you out of the hospital will be the doctor.' . . . He said they wasn't going to let him out, the doctor wouldn't talk to him about getting out; that he was going to get out of there whether or no. My opinion was that he was in pretty poor mental condition. He apparently did not know or understand what he was doing on that occasion."

About 7 o'clock or later in the evening of March 23, after the will was signed, Swenson visited the testator. A nurse told Swenson the testator had made his will that day. Swenson testified:

"The nurse asked me to stay with Mr. McDonald. She wanted to go out a little. When she went out, I took the chair and moved up to his bed and talked with him. I says, 'Well, you made a will today, I understand you made a will today, Mr. McDonald,' and he said, 'Yes.' 'They told me if I would make a will,' he said, 'that I would get better.' I don't remember what we talked about then after that, that night. I stayed an hour or so every time I went to see him. . . . On the particular evening of the day the will was executed I think that he was very sick and he didn't know what he was talking about. . . . I think his condition seemed worse the night of the day the will was executed than when I saw him on my previous visit." .

On the evening of March 24 the testator was visited by Phifer. Phifer testified:

"He didn't say much of anything on that evening I was up there. He was restless. I don't recall any conversation with him at all. He would talk once in a while, while tossing about in bed. He wouldn't talk to me because he didn't know who I was. He never did recognize me after the first week I went up there, not until I would tell him who I was. The nurse or myself, one or the other, would tell him who I was after I went to the room. That is the only way he would recognize who I was. I recall he muttered statements about he was going to take a swim in the Gulf of Mexico. . . . In my opinion he had no mental condition at all; in other words, he was all gone, as we would say."

L. Myers, an old neighbor and friend, visited the testator at the hospital on the evening of March 24. Myers' brother, whom the testator knew, was with Myers. The testator did not recognize them. Myers testified:

"I asked him how he felt and he said he had a severe pain in the back of his head; I asked who his doctor was and he said Doctor Holmes was his doctor. I says, 'Tom, I don't know any doctor in Wichita by the name of Holmes,' and he said, 'Dr. Winn Holmes,' and I says, 'Tom,' I says, 'He is an attorney,' and he got mad at me and got up and turned over and turned his back to me and laid there a little while and he turned over again and says, 'I have got to get up and get out of here.' He says, 'I have got an appointment at the Allis hotel, at four o'clock.' He says, 'I am going to Texas on a big land deal.' From my observation of him in the hospital and my acquaintance with him through the years I am of opinion he was crazy, nothing else, on March 24, 1933."

Between noon and 1 p. m. the day after the will was made the testator was visited by Kessler, who testified:

"At that time he says, 'I am living at the Allis hotel.' He says, 'You know where the Allis hotel is up there on the corner of First and Market.' [Wrong location.] He says, 'It runs a block down this way and a block over that way.' He said he was going to build one of them when he got out of there—he thought it was a paying proposition. He wanted to know if I knew Doctor Callahan. I told him, 'Yes.' 'Well,' he says, 'You can't trust Doctor Callahan.' 'Oh,' I says, 'I guess so, Tom. He is a good fellow.' He says, 'No. You can't trust him.' He says, 'He had a woman up there about forty-five years old and wanted me to sign a will.' He says, 'I guess she is after my property.' I asked him, 'Did you sign the will, Tom?' He said, 'No, but they told me if I would sign it I would get better.' "

The attending physician testified that about the 19th of March the testator began to improve and his condition was pretty good. Purporting to give the testator's condition from the hospital clinical record, the attending physician testified as follows:

"On March 18 he was restless, had a poor day and a poor night. On March 19 he had a better day. On the 20th he had a fairly good day. On the 21st he had a fair day and better night; respiration was normal. On March 22 at times he was talking and mumbling and on March 23 he had a fairly good day. On March 24 he was quiet at times and mumbling at times and had a good day."

Another physician, with the same chart before him, testified for plaintiffs that on March 22 the patient was talking at random, was very restless, and had three emptyings of the bladder, soiling the bed. On March 23 the patient had an involuntary passing of urine, and two involuntary stools. Later in the night the patient was very restless and kept jerking at the bedclothes. On March 24 the record showed continued restlessness, talking constantly, and involuntary urination. The chart showed that on March 19 he was given sodium amytal, which is a very strong sedative, probably next to morphine,

given hypodermically. On March 23 he was given allonal, also a sedative.

From the foregoing the court might have concluded that if the days on which the testator's friends visited him were good days and fair days, the terms good and fair needed redefinition. The court was also authorized to conclude that if on the afternoon of March 23 the testator possessed all the elements of competency to make a will, he must have made sudden recovery and then suffered sudden relapse.

It is perfectly manifest something was wrong with the testator when he attempted to sign the will. The formless marks do not make names. Considering the marks as a signature, it is egregiously abnormal. It would be idle to contend, in the face of the dexterity disclosed, that any muscular inhibition caused omission of part of the testator's name. If he could have signed a will disposing of his entire estate with something resembling his signature, doubtless he would have done so, and without expert testimony the court was warranted in inferring the testator lacked mental capacity to write his name, and when he was through, he did not know what he had done. There was fair basis for nonexpert inference his mental faculties were in a swirl, much like his pencil.

J. C. Shearman, of Wichita, is an examiner of questioned documents who possesses the highest qualifications for work in his field, has had wide experience, and his services are in much demand when genuineness of signature and related subjects are involved. He is not a physician nor an alienist, but he has extended his studies to ascertain relation between abnormality of signature and abnormality of mental state when the signature was made. He testified he had investigated a sufficient number of writings made by persons not mentally sound that he could tell whether the signature was normal or abnormal, and could tell some of the causes of abnormality. Of course there are border-line cases, and he did not profess to know an exact mental state from handwriting alone, but he said the physical evidence on paper is utilizable as a basis for opinion.

On the basis of his study and experience and an examination of the testator's signatures, Mr. Shearman testified the testator was not in the same mental condition when he signed the will that he was in when the normal signatures were made; the omission of "Mc" from the testator's name indicated mental lapse at that point; and that the freedom and grandeur with which the signature

was written indicated exhilaration—a grand and glorious feeling.' Objections were made to this testimony, which were overruled, and a motion to strike out the testimony was denied. The first question is: Was the testimony admissible at all?

An objection to the testimony was that Mr. Shearman did not qualify as a mental expert. Without discussing the subject of what it takes to be a mental expert, the witness qualified sufficiently respecting the limited subject upon which he expressed his opinion.

A physician who was an expert in nervous and mental diseases testified for plaintiffs the medical profession had not gotten to the point where human ailments could be diagnosed from handwriting. Mr. Shearman made no such pretension. However, the present state of medical science is due to amazing discoveries, the result of pioneer work in new fields, involving the accumulation of data, study and comparison of data, formulation of tentative hypotheses, and verification of the soundness of such hypotheses. Mr. Shearman discovered there were indications, in writings, of normality and abnormality which were frequently available as the basis of opinion. The fact that he made the discovery before the doctors did, does not detract from the result.

Verification of Mr. Shearman's conclusions in this case is found in part in testimony relating to the testator's mental condition. The record does not show Mr. Shearman had any information concerning what this testimony would be.

Just before and just after the will was signed the testator was in a state of mental exaltation. He was engaged in conducting big land deals far from home, and on one occasion, looking toward nurses in the room, he told a visiting friend he came back from Calientes, Mexico, and brought two Mexican girls with him. He was no longer living in a room rented from a landlady. He was living in a big hotel extending a city block in each direction. He intended to build a hotel himself. There was money in it. He had highly important business to do, and he had to be up and about it. He had an engagement at four o'clock at the Allis hotel; he was going to Texas on a big land deal. So, when called on to sign his name, this personage of large affairs made the heroic flourishes found at the end of the will. The tension, however, relaxed for a moment, and this Irishman left the "Mc" out of his name.

Defendants say the question involved has not been decided, and admission of the testimony was necessarily prejudicial error. The

court has not investigated the authorities, except such as are cited in the briefs, because the fact that the question has not heretofore been specifically decided is not sufficient to warrant refusal to admit the testimony. If it were, growth of the common law would be arrested, and it would be frozen where it is.

At the 1935 commencement, the president of Cornell University, addressing the graduates of the medical school, said there was a tendency on the part of the medical profession and on the part of the legal profession to act on the premise, "Whatever was, is right." A decision by this court that the testimony should have been excluded because there is no established rule of evidence authorizing its admission, would demonstrate soundness of the criticism.

The court concludes the testimony of Mr. Shearman was properly admitted. There is debate in the briefs respecting consideration and weight given the testimony by the trial court. For that reason, admissibility of the testimony has been discussed. What weight should ultimately be given the testimony was a matter for the trial court to determine. Before finally disposing of the case, the court put into the record a statement showing the testimony was not regarded as of particular importance to the decision.

The foregoing includes only a portion of the evidence favorable to plaintiffs and is not a review of the evidence generally. There was much evidence favorable to defendants. The signature to the will was written with the testator's right hand. There was abundant evidence the testator's left side was paralyzed and not the right side, as defendants contended. The evidence sustaining this view was utterly incompatible with the opposing evidence, and cast serious doubt on much more evidence for defendants. It was the function of the district court to resolve the conflict. This court may determine whether evidence is sufficiently substantial to create a conflict with substantial evidence, but the weighing of evidence involves exercise of original and not of appellate jurisdiction.

There was much medical expert testimony relating to mental capacity. The court declined to choose between the irreconcilable views, and found for plaintiffs from other evidence. This court declines to disturb the district court's finding.

The judgment of the district court is affirmed.

WEDELL, J., not participating.