[Crim. No. 4961. In Bank. Nov. 29, 1949.]

THE PEOPLE, Respondent, v. ARMAND LETOURNEAU, Appellant.

George T. Davis and Kenyon C. Keller for Appellant.

Fred N. Howser, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant was charged with the murder of his mother-in-law, Mrs. Rosario Maniscalco, and pleaded not guilty and not guilty by reason of insanity. A jury found that he was guilty of murder of the first degree and did not specifically recommend the penalty; the same jury found that he was sane at the time he committed the murder. Defendant

appeals from the ensuing judgment imposing the death penalty and from an order denying his motion for new trial. His principal contention is that the trial court erred to his prejudice by excluding, on the trial of the general issue of not guilty, proffered evidence which assertedly would have tended to show (or raise a reasonable doubt) that he did not possess the mental state ("malice aforethought," deliberation and premeditation) essential to constitute the homicide murder of the first degree. We have concluded, for reasons hereinafter detailed, that defendant has failed to establish error in respect to this contention, and that other points urged by him show no miscarriage of justice.

In support of his main contention defendant relies upon the recent holding of this court (in *People* v. *Wells* (1949), 33 Cal.2d 330, 350-351 [202 P.2d 53]) that "As a general rule, on the not guilty plea, evidence, otherwise competent, tending to show that the defendant, who at this stage is conclusively presumed sane, either *did* or *did not*, in committing the overt act, possess the specific essential mental state, is admissible, but evidence tending to show legal sanity or legal insanity is not admissible. Thus, if the proffered evidence tends to show not merely that he *did* or *did not*, but rather that because of legal insanity he *could* not, entertain the specific intent or other essential mental state, then that evidence is inadmissible under the not guilty plea and is admissible only on the trial on the plea of not guilty by reason of insanity. The standard by which the trial judge must appraise the admissibility of evidence in every case is, of course, the familiar 'right or wrong' standard . . . by which legal insanity as a defense is gauged. [*McNaughten's Case* (1843), 8 Eng.Rep.R. 718; see 7 Cal.Jur., p. 862, § 21, and cases there cited.] Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible." As is hereinafter shown, the exclusionary rulings of which defendant complains were made upon stated grounds contrary to this holding of the Wells case and, if no other ground for the rulings existed, error would appear; however, such rulings were actually correct because (as in *People* v. *Danielly* (1949), 33 Cal.2d 362, 364 [202 P.2d 18]), "although the proof of malice aforethought and deliberation and pre-

meditation was, of course, an essential part of the prosecution's case, the rejected evidence was not materially relevant to any theory of defense raised upon the trial of the general issue.''

The objective circumstances of the killing, viewing the evidence most favorable to respondent People insofar as it is in conflict,[1] were as follows: In March, 1946, defendant married Catherine, the daughter of Antonio and Rosario Maniscalco. About one month after their marriage, defendant and his wife went to live with the wife's mother and father. Upon the premises were a two-flat dwelling and a small cottage. A son of the Maniscalcos and the son's wife, Roberta, lived in the cottage with their two small children. The elder Maniscalcos and other members of the family lived in the upper flat. Defendant and Catherine lived in the lower flat. Defendant killed not only his mother-in-law, Mrs. Maniscalco, but also his wife's infant niece, Rosario Cecchi, aged about 11 months. He was not charged with the latter killing. The infant Rosario was left in the care of her grandmother, the elder Mrs. Maniscalco, while her parents worked. Defendant and his wife were godparents of the infant girl. Prior to April 21, 1948, the day of the killings, defendant had consistently evidenced great affection for his mother-in-law and the infant niece.

On the morning of April 21, 1948, defendant had ''cramps all over'' and did not go to work. His wife, who was regularly employed, went to her work, as did other adult members of the family. The only members of the family, aside from defendant, who remained on the premises were Mrs. Rosario Maniscalco (defendant's mother-in-law), the infant Rosario Cecchi, and Roberta and her two children. Some time after 10 o'clock, while the mother-in-law was at the grocery store, Roberta was in her bedroom making the beds, and the three children were playing in the cottage. Defendant came to Roberta's kitchen window, stood on a chair, and forced open the window. Roberta went into the kitchen and defendant said, ''You better let me in. I am going to get you anyway.'' Roberta unlocked the door of the cottage and ran to the street. As she passed defendant he ''made a grab,'' caught Roberta's

---

[1]Such conflict as exists will hereinafter appear from the summary of defendant's testimony. The basic facts of the charged homicide are not in dispute. In his opening statement to the jury counsel for the defendant frankly recognized the circumstances with which he was confronted. He said: ''This is going to be the kind of a case where there is not going to be a dispute whether he did or did not kill these people . . . There is no disagreement here about the facts. This man did the killing. He killed both people.''

dress, but she "broke loose and ran out . . . and half way down the block." There she met her mother-in-law and told her that defendant "was breaking in the house after me, and she got mad." Roberta returned to her cottage. The mother-in-law went into defendant's flat and Roberta could hear her "hollering real loud," but could not understand what she said. The mother-in-law then returned to Roberta's cottage and picked up the infant Rosario. Defendant called to the mother-in-law from his flat, asking her to help him fix some artichokes. She replied that she would help him and went into his flat carrying the baby. Some time later (how long, Roberta did not recall) defendant returned to Roberta's cottage. The following description of events is taken from her testimony: "he had blood coming down his face, and he asked me for a Bandaid, and I said, 'What happened to you now?' And he said my mother-in-law had hit him with a ring, that he had a little quarrel, and she hit him with a ring." Roberta obtained a bandage and, as she was preparing it, defendant "made a grab for me . . . He had my dress up and I started to holler, and I turned around, and he had a knife and he said, 'If you holler, I will cut your throat.' And I told my boy to call grandma; and he acted like nothing was wrong . . . [Defendant] grabbed me and pulled me on my little boy's bed . . . and took my pants off." Defendant removed his trousers and completed an act of sexual intercourse with Roberta. Blood from the cut on defendant's face was on her face and "I was trying to get away from him. He kept threatening me and then I said, 'Can I get up and wash the blood off my face?' . . . He said, 'O.K.' And I got up to make a break . . . and he grabbed me and put me on my bed," where he accomplished two more acts of sexual intercourse. He then put on his trousers, combed his hair, and left the cottage. Roberta "waited until he went out, . . . and I put my pants on and I ran upstairs to tell my mother-in-law . . . what he had done . . . [Defendant] was standing at the phone, with the receiver in his hand . . . He said 'Dial this number,' " and Roberta dialed a number as defendant directed. (Although Roberta did not know it, this was the number of the police station.) She then "started walking away, and he said to me, 'Guess who I am dialing?' And I ignored him, and then he said, 'Come over here. There is a murder.' " Roberta at once ran from the house and into the street in search of help. A police officer arrived and Roberta went with him to defendant's flat. The officer tried the door, found it locked, and knocked.

Defendant admitted them. "I [Roberta] said, 'Where is my mother-in-law and the baby?' And he said coldly, 'In there.' And it was covered up with the blanket, and I looked, and I ran out."

In the dining room of defendant's flat were the bodies of his mother-in-law and infant niece. Defendant had struck each of them many times about the head with a wrench, fracturing the skull and inflicting many lacerations and bruises, then, with a carving knife, had stabbed each of them repeatedly in the head, arms, chest, abdomen and thighs and partially eviscerated them.

When he was questioned by the police and a deputy district attorney at about 2:20 in the afternoon of April 21, 1948, defendant gave an account of the killings largely similar to that which he gave in his testimony. According to defendant's testimony, Roberta (sometimes referred to as Bobbie) came into his flat on the morning of the 21st. They were "holding hands" when their mother-in-law came in. Defendant asked the mother-in-law to prepare some artichokes. As the mother-in-law was doing this, holding the baby under her left arm and a cup in her right hand, Roberta said, "She is going to squeal," and handed defendant the wrench. Defendant "took the wrench and I did not hesitate, and I hit her . . . [S]he swung around and she is a heavy woman, and that cup hit me under the eye here and that got me dizzy a little bit too, and I don't know—I must have hit her some more after that, I guess. I don't quite remember how many times I hurted her, and after that I turned around and Bobbie had the knife in her hand . . . I don't remember hitting the baby . . . I don't remember if I did [kill them], but I know I hit her [the mother-in-law] . . . I am pretty sure I did have that knife . . . I don't remember cutting them up, though." Defendant changed his clothes and wiped off the knife. At Bobbie's suggestion they went to her cottage, taking the knife to "clean it better." Defendant left the wrench on his kitchen table. In Bobbie's bedroom she voluntarily engaged in sexual intercourse with defendant. Defendant testified that he was not angry at his mother-in-law, that he loved her. Asked, "Why did you hit her on the head with that wrench?" defendant replied, "Bobbie told me she was going to squeal," and again, "I don't know . . . I didn't realize anything at the time." Defendant testified further that it was only "when he got through having intercourse" that he "realized when she gave

me that wrench to hit my mother-in-law''; defendant got up, dressed, and went to telephone the police; he dialed ''Information'' and asked for the number of the police department; Bobbie came in and defendant asked her to dial the number because ''I was shaking . . . I was nervous; I was scared''; after she had dialed the number Bobbie asked, ''Who are you calling?''; defendant replied, ''Don't you know what we done downstairs? I am calling the police''; Bobbie said, ''No, no, don't call the police,'' and ran out.

According to the testimony of a police officer relating a statement assertedly made on the afternoon of April 21 defendant remembered that ''When I struck her [the mother-in-law] on the head she dropped the baby on the floor . . . The baby was crying, so I struck the baby, too.'' Defendant assertedly also remembered at that time that ''I stabbed my mother-in-law, and I ripped her open . . . I also stabbed the baby.''

*The Exclusion of Evidence Which, Defendant Contends, Would Tend to Show Lack of Malice Aforethought, Deliberation and Premeditation*

■ During his opening statement to the jury defendant's counsel said that he intended to adduce evidence ''directed to the mental state of the defendant. Now, I am not talking to you specifically about whether the defendant is sane or insane at this time . . . We will show you facts which will demonstrate an explosion of the mind . . . that on this occasion he went so far berserk as to be nothing mentally more or less than a wild beast . . . We are further going to show you . . . that this man only a short time ago was confined in the psychopathic ward of the San Francisco Hospital.'' Counsel for the People then said, ''You are not going to show anything of that kind during the first trial . . . We are not going to go into this man's . . . sanity.'' Defendant's counsel replied, ''I am not going to show it for the purpose of sanity. I am going to show it for the purpose of demonstrating a possible case of hysterical amnesia, which is a proper question to raise in this trial.'' Again, defendant's counsel indicated that he intended to present the defense of ''loss of consciousness at the particular time the thing happened, that has nothing to do with insanity.'' The trial judge properly ruled, ''That is right.'' Defendant's counsel concluded his opening statement by saying, ''we will have to let the evidence demonstrate for all of us exactly what degree of crime, if any, has been committed.'' These excerpts from defendant's opening statement indicate that defendant's

counsel had a correct understanding as to the type of evidence of mental condition which is admissible on the trial of the general issue; i. e., that he could introduce evidence tending to show that defendant was unconscious at the time of the killings and thus incapable of committing crime (Pen. Code, § 26), and evidence tending to show that defendant did not possess the requisite specific mental state of "malice aforethought" and a deliberate, premeditated intention to kill, so long as the evidence did not tend to show that because of legal insanity, he *could not* possess the requisite mental state. However (and in this, as previously indicated, the case is similar to *People* v. *Danielly* (1949), *supra*, 33 Cal.2d 362, 364), defendant did not offer competent evidence of mental condition which would tend to negative his possession of the requisite state of mind. The instances of exclusion of evidence of which he complains are as follows:

█ Defendant's counsel asked the autopsy surgeon who had described the wounds which caused Mrs. Maniscalco's death, "Would you say, Doctor, that whoever inflicted the wounds on this woman certainly must have been operating at the time under an abnormal and just under an abnormal frame of mind, let us say?" The district attorney objected on the ground that "The Doctor cannot possibly answer it categorically." The trial court correctly sustained the objection; no proper foundation for the question had been laid. There is no showing that the doctor had, or legitimately could form, an opinion which could aid the jury in determining the state of mind of the killer who inflicted the wounds. In the absence of some affirmative showing of related materiality it will not be presumed that from mere examination of the wounds, the autopsy doctor could do more than speculate as to what the state of mind of the killer, insofar as it could properly constitute a subject of expert testimony is concerned, might have been; it is not shown that from the nature of the wounds alone the doctor could draw any material inferences which the jury themselves could not draw.

█ Defendant unsuccessfully sought to show, on the trial of the general issue, that prior to the homicide he had been in the psychopathic ward of the city hospital. A police officer, testifying for the People, was asked by defendant's counsel on cross-examination, "did you ascertain at any time whether this man had been confined to the psychopathic hospital in San Francisco?" The People's general objection to this ques-

tion was sustained; no offer of proof was made. Later on, however, in relation to the incident, defendant testified that approximately six months before the homicide his wife took him to the city hospital, ''and when I came back to myself, I was in the coocoo ward.'' The People moved to strike the quoted portion of defendant's testimony on the ground that it was ''self-serving'' and ''attempting to inject into this hearing a matter that is not proper''; the motion was granted. Defendant did not, on the trial of the general issue, make any offer of proof to show the relevancy of this line of inquiry. (See *Brown* v. *Southern Pacific Co.* (1949), 92 Cal.App.2d 639, 644 [207 P.2d 632].) However, it appears from the evidence introduced on the trial of the issue of insanity that the excluded testimony was not relevant to the general issue. At the second stage of the trial, when defendant's inquiry into the subject was not limited, his wife thus described the occasion upon which he was taken to the hospital: Defendant had been ''drinking all day''; he became violent, tore up a bed sheet, and announced, ''I am getting blind.'' His wife and brothers-in-law took defendant to the hospital, where he was examined and stayed for one night. On the trial of the issue of insanity a psychiatrist testified that he had seen the city hospital report and that it stated that the doctor who had examined defendant at the hospital ''made a diagnosis of some nervous condition—I have forgotten what it was—not a mental condition—and alcoholism and blindness due to . . . a combination of those things.'' Defendant has not attempted to show the nature of the ''nervous condition'' and he does not try to explain, and it is not apparent, in what way the above incident would have any bearing on the question whether, six months later, he had the state of mind which would make the killing of his mother-in-law murder of the first or homicide of a lower degree. Certainly the incident does not appear to have any material bearing on the issue as to whether at the time of the homicides he was in a state of unconsciousness.

▮ On the trial of the general issue defendant was not allowed to testify as to his first marriage in Canada in 1936, and the fact that he had never struck his first wife, and the circumstances which led to his separation from his first wife in or before 1940. On the trial of the issue of insanity, defendant testified at length that his first wife had an affair with a worker employed on defendant's farm, became pregnant by this worker, and attempted to poison defendant by

giving him tea and soup containing arsenic. Defendant does not explain how, if these incidents actually occurred, they would affect defendant's formation of a deliberate intent to kill Mrs. Maniscalco several years later, in different surroundings, among persons whom defendant had not known at the time of his first marriage. Defendant made no attempt to show that the incidents did not occur or that his belief that they happened was the product of a diseased mind or that they in any way tended to prove that he was subject to amnesia. Thus the testimony as to defendant's first marriage, it developed when all the evidence was in, was relevant to no issue at either stage of the trial.

Defendant was asked, "before April 21, 1948, did you ever strike or injure any human being?" and answered, "Never did." The prosecuting attorney objected and the trial court ruled, "I will sustain his objection. I think it is irrelevant." There was no motion to strike defendant's answer. Defendant complains of the sustaining of the objection. However, his answer to the question is in the record and, furthermore, it is not suggested how the extremely general fact that he had or had not previously injured any human being would materially affect the proof as to his state of mind on April 21, 1948.

The above are the only instances of exclusion of testimony which defendant specifies as erroneous because of the asserted relevance of the testimony to his possession of the mental state necessary (on that theory of the case) to constitute the killing murder of the first degree. The evidence adduced at the trial of the issue of insanity and at a subsequent hearing as to whether he was a sexual psychopath has been examined in order to determine whether there was other evidence, relevant on the trial of the general issue, as to which defendant's counsel neglected to make a specific offer of proof at the first stage of the trial because he was led to believe, by the tenor of the trial court's rulings, that it would admit *no* evidence as to mental condition during that stage of the trial. Such examination of the record has disclosed no evidence which should have been before the jury at the time they were considering whether defendant possessed the conscious and deliberate intent which is an element of first degree murder. There is no expert testimony tending to show that defendant was unconscious or suffering from amnesia at the time he committed the killings; all such testimony is to the contrary. On the trial of the issue of insanity two of the three

experts suggested that the manner of the killings was an indication that they may have been sadistic, but no expert testified that he had formed an opinion that defendant was a sadist. On the hearing as to sexual psychopathy the expert evidence in this connection was that the killings were not sadistic, not to arouse sexual desire, but were to eliminate an obstacle to fulfillment of a desire which previously existed. There is no evidence which indicates that killing may not be at the same time sadistic and, in the legal sense, deliberate and premeditated.

### Asserted Errors in Instructions on the Trial
### of the General Issue

■ Defendant complains of the giving of the following erroneous instruction: "In homicide cases where the killing is proved, it rests on the defendant to show justification, excuse or circumstances of mitigation, subject to the qualification that the benefit of the doubt is to be given to the defendant." The instruction resembles section 1105 of the Penal Code.[2] The impropriety of reading that section to the jury is fully discussed in *People* v. *Cornett* (1948), 33 Cal.2d 33, 43-44 [198 P.2d 877], and cases there cited. Under an instruction in the language of that section the jury "may believe that mitigating circumstances do not exist unless the defendant proves the existence of such circumstances by a preponderance of the evidence or by some other degree of proof. Moreover, the instruction is erroneous in that the jury was not fully advised that such an instruction has no application in determining the degree of murder, and that it is applicable only in determining whether the homicide constitutes murder or manslaughter, or is justifiable or excusable . . . It may have the effect of foreclosing any consideration by the jury that mitigating circumstances, although not sufficient in law to justify or excuse the homicide, may be enough to reduce the crime to second degree murder by counteracting the element of premeditation or deliberation" (p. 44 of 33 Cal.2d). Even though the instruction here given is qualified by the direction that "the benefit of the doubt is to be given to the defendant," this qualification does not correct the in-

[2]Pen. Code, § 1105: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

struction, for it is error to intimate to the jury that *any* burden of persuasion rests upon the defendant on the trial of the general issue.

However, it does not appear that any miscarriage of justice resulted from the giving of the erroneous instruction, even though its error relates to the only important ultimate question presented by the evidence; i. e., whether the killing was murder of the first or of the second degree. As to this question the jury were correctly and specifically told, "if you are convinced beyond a reasonable doubt that the defendant is guilty of the crime of murder, but still if you entertain a reasonable doubt whether the killing was wilful, deliberate and premeditated, or done in the perpetration or attempt to perpetrate rape, or by lying in wait, then in such a case you cannot find the defendant guilty of murder of the first degree," and "If you find beyond a reasonable doubt that the killing is murder, evidence tending to establish provocation may also be considered by you in determining the degree of the murder, and if, after due consideration of such evidence, you should entertain a reasonable doubt as to whether there existed at the time of the homicide in the mind of the defendant the deliberation and premeditation essential to constitute murder of the first degree, or that the killing was done in the perpetration of rape or attempt to perpetrate rape, or while lying in wait, it would then be your duty to find the defendant guilty of murder of the second degree. I instruct you that if you believe from all the evidence in the case beyond a reasonable doubt that the defendant is guilty of homicide, but have a doubt as to the degree of the offense of which the defendant is guilty—whether it is murder in the first degree, murder in the second degree, or manslaughter, you will give the defendant the benefit of such doubt and find him guilty only of the lowest offense as to which you may find him guilty beyond a reasonable doubt." It does not appear that the jury, in deciding that defendant's admitted intentional striking of Mrs. Maniscalco with a wrench[3] was in course of deliberate,

---

[3]Defendant testified: "I took the wrench and I did not hesitate, and I hit her . . . It was a pipe wrench . . . I hit my mother-in-law . . . and she swung around and she is a heavy woman . . . and I don't know— I must have hit her some more after that, I guess. I don't quite remember how many times I hurted her . . . I hit her in the head . . . I know I hit her there, and when she turned around I hit her again. I might have hit her again but I don't remember how many times . . . After that . . . I took the knife . . . I must have cut her up. I don't know what I did . . . I don't remember if I did [kill her], but I know I hit her . . . Q. Why did you hit her? . . . Can you explain it? A. No."

premeditated murder, chose to disregard these detailed, correct instructions and to follow a misleading interpretation of the vague instruction first above quoted. ■ As to the instruction under attack, it may be noted that it is erroneous also in that it purports to place some burden of persuasion on defendant when merely the *fact,* and not the *perpetrator,* of the killing has been proved. This error could have no prejudicial effect here, for defendant admitted that he committed the homicide.

■ The trial judge did not instruct the jury that the evidence of oral admissions of defendant is to be viewed with caution. (Code Civ. Proc., § 2061, par. 4.) Defendant complains of this omission and urges that the error was made more serious by the giving of an instruction that circumstantial evidence includes, among other things, admissions and that "There is nothing in the nature of circumstantial evidence which renders it any less reliable than any other class of evidence." There were in evidence admissions of defendant assertedly made to a police officer and a deputy district attorney. Defendant did not deny making these admissions, but testified that he did not recall that, in the course of them, he described the manner in which he cut his mother-in-law and admitted the killing of the baby. He testified, further, that he did not in fact recall the cutting of the woman or the killing of the baby. However, from the entire record it does not appear reasonable to believe that, if the cautionary instruction had been given and the instruction concerning circumstantial evidence had not erroneously classified admissions as among the sorts of evidence which are not "less reliable than any other class of evidence," the jury would have disregarded the testimony relating to the admissions of defendant assertedly made immediately after the killings, accepted his testimony at the trial that he had no memory of details which he had previously described, and thus come to the conclusion that there was a reasonable doubt as to whether defendant had acted with deliberation and premeditation or in the course of carrying out an intent to commit rape. (See *People* v. *Koenig* (1946), 29 Cal.2d 87, 91 [173 P.2d 1].)

On the trial of the issue of insanity (a part of the "entire cause" which it is our duty to examine [Cal. Const., art. VI, § 4½]) two court appointed alienists testified that defendant told them that he had hit the woman and the baby with the wrench and slashed and cut both bodies; the third alienist

testified that defendant said "he didn't quite remember killing the baby"; defendant stated, further, that he did strike the woman and the baby and remembered taking the knife from Bobbie and returning it to her to be cleaned, but not what he did with the knife between those two occurrences. It thus appears that the extent to which defendant claimed to remember the details of the killings varied somewhat on different occasions. This supports the conclusion that no miscarriage of justice has resulted even if the jury, on the trial of the general issue, gave full credence to the testimony relating defendant's asserted admissions.

 The record wholly fails to show that any instructions whatsoever, other than a single one on the insanity phase of the trial, were or were not requested by either the plaintiff or the defendant. Instead, the record shows a stipulation that an "oral charge" be given by the judge and transcribed by the court reporter. Under such circumstances, the appellant fails to show and we have no means of ascertaining whether the statement or the omission of any specific proposition of law was requested by a particular party or was given or omitted on the court's own motion.· If a party is to make any point, whether of commission or omission, in relation to the giving of instructions, all the instructions requested should be filed and included in the record and, as stated in *Vaughn* v. *Jonas* (1948), 31 Cal.2d 586, 596 [191 P.2d 432], "Each instruction should be identified by a number and should indicate by whom it was requested or that it was given by the court of its own motion; on each requested instruction the trial judge should endorse the fact as to whether it was given or refused or given as modified, with the modification, if any, clearly indicated." The burden is on the appellant to affirmatively show error and prejudice therefrom; he has not, on this record, sustained such burden.

*Contention that the Jury's Determination as to Penalty was Influenced by Conjecture and Public Opinion*

 After the jury had deliberated for three hours on the issues raised by the plea of not guilty, it presented, in open court, the following written question to the trial judge: "Does the imposition of 'imprisonment in the State prison for the term of his natural life' allow of later pardon or parole and possible release?" The trial judge stated, "that is something that is a matter for the Court. It is not, in the processes of law, a matter for your consideration . . . and we will not

answer it.'' This reply was in part correct; the possibility of pardon or parole was not for the jury's consideration. (See *People* v. *Alcalde* (1944), 24 Cal.2d 177, 189 [148 P.2d 627].) It does not appear that defendant could have been prejudiced by the fact that the trial judge, in a strictly technical sense, erroneously stated that the questions were ''for the Court,'' whereas the question of pardon is (at least ultimately) for the Governor (Cal. Const., art. VII, § 1; Pen. Code, § 4800) and the question of parole is for the Adult Authority, the power of which is defined by the Legislature (Pen. Code, §§ 3040, 3046).

Defendant complains that the mere asking of the question showed that the jury, contrary to an instruction which had been given, was being influenced in its deliberations by ''conjectures, . . . public opinion or public feeling'' that if they recommended a life sentence defendant might some day be released and that such release would be undesirable. He urges that, at the least, the trial judge, when the question was asked, should have reread the instruction forbidding the jury's acting under such influences. But we must presume that the jury followed the instruction which forbade its being influenced by conjecture or public feeling, and accepted the judge's statement that it was not to consider the possibility of pardon or parole. (See *People* v. *Ferlin* (1928), 203 Cal. 587, 600 [265 P. 230]; *People* v. *Anderson* (1932), 120 Cal.App. 5, 8 [7 P.2d 202].)

### *The Refusal, on the Trial of the Issue of Insanity, to Permit Defendant's Wife to Testify to her Opinion of his Sanity*

The trial judge sustained People's objections to the questions, asked of defendant's wife, ''what is your opinion, or, have you formed any opinion as to whether he was sane or insane at the time this act was committed?'' and ''Do you think he is sane, yourself?'' These rulings were erroneous. (Code Civ. Proc., § 1870, par. 10: Evidence may be given of ''the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given.'') The trial judge, on further reflection, came to this conclusion and, at the opening of court the next day, asked defendant's counsel to recall Mrs. Letourneau ''so that I may place the question to her.'' Defendant's counsel replied, ''I am through, your Honor, and I don't care about asking her to come back ... You can call her and question her if you want to ... It was asked at the end of her testimony at the time when

it had importance and bearing. To call her back and re-ask her that question would seem to me to defeat the purposes of her being asked the question in the first place. So, I can't see how I can rebuild my case back to the point when the question was asked, without prejudicing my client now. I will have to stand on the record and let it go at that.'' ▉ Having thus rejected the offer of the trial judge to cure the error, defendant cannot now complain of it. (*People* v. *Glover* (1903), 141 Cal. 233, 246 [74 P. 745]; *People* v. *Hatch* (1912), 163 Cal. 368, 377 [125 P. 907]; *People* v. *Klopfer* (1923), 61 Cal.App. 291, 295 [214 P. 878]; *People* v. *Morley* (1928), 89 Cal.App. 451, 459 [265 P. 276].) ▉ Furthermore, under the circumstances, it is not shown that the error was prejudicial, for Mrs. Letourneau had testified in detail to the conduct of defendant upon which her opinion would have been based, and it does not appear that the jury would have reached a contrary result had it known that one lay witness, the wife of defendant, was of an opinion contrary to that of the three court-appointed experts who testified that in their opinion, based upon the facts to which Mrs. Letourneau testified and other facts, defendant was sane.

### *The Order of the Trial of the Issue of Insanity*

▉ Defendant complains that the trial court did not comply with section 1369 of the Penal Code when, despite defendant's request, it permitted the People to make an opening statement to the jury before defendant's counsel made his opening statement and permitted the People to open and close the argument to the jury. However, that section is in a chapter entitled, ''Inquiry into the Insanity of the Defendant before Trial or after Conviction.''[4] No section of the Penal Code specifically directs the order of the trial upon a plea of not guilty by reason of insanity, and it has been repeatedly held that defendant has no right to open and close the argument to the jury (*People* v. *Hickman* (1928), 204 Cal. 470, 482 [268 P. 909, 270 P. 1117]; *People* v. *Goold* (1932), 215 Cal. 763, 766 [12 P.2d 958]; *People* v. *Kimball* (1936),

---

[4]The section provides, ''The trial of the question of insanity must proceed in the following order:

''1. The counsel for the defendant must open the case and offer evidence in support of the allegation of insanity;

''2. The counsel for the people may then open their case and offer evidence in support thereof; . . .

''4. When the evidence is concluded . . . the counsel for the people must commence, and the defendant or his counsel may conclude the argument to the jury . . .''

5 Cal.2d 608, 611 [55 P.2d 483]; see, also, *People* v. *Hardy* (1948), 33 Cal.2d 52, 65-66 [198 P. 865]) although the trial court may permit him to do so (see *People* v. *Lee* (1930), 108 Cal.App. 609, 613 [291 P. 887]).

For the reasons above stated, the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

EDMONDS, J.—For the reasons stated in *People* v. *Wells* (33 Cal.2d 330 [202 P.2d 53]) and *People* v. *Danielly* (33 Cal. 2d 362 [202 P.2d 18] evidence tending to prove that, at the time of commission of a crime, a defendant did not have the state of mind which the law requires as an essential element of the offense is admissible upon a trial of the issue presented by a plea of not guilty. To establish the defendant's state of mind, either the People or the defendant may offer any evidence competent under the general rules of admissibility, which is relevant to that issue.

Letourneau's counsel asked the autopsy surgeon, who had described the wounds causing Mrs. Maniscallo's death, "Would you say, Doctor, that whoever inflicted the wounds on this woman certainly must have been operating at the time under an abnormal and just under an abnormal frame of mind, let us say?" The district attorney's objection that "The Doctor cannot possibly answer it categorically" was sustained. The majority opinion concludes that the ruling was proper because there was no showing of related materiality, and the inquiry called for an opinion upon a subject which is not a proper subject of expert testimony.

Had the doctor stated that the inflicter of the wounds was then acting under an abnormal frame of mind, his opinion would have been logically relevant to the issue of the defendant's state of mind at the time of the homicide. That there may be a logical correlation between the circumstances of the homicide and the killer's mentation is recognized in *People* v. *Kafoury,* 16 Cal.App. 718, 720 [117 P. 938].

Moreover, there is authority for holding that the examination of the autopsy surgeon concerned a subject upon which expert testimony is admissible. In *Gibbons* v. *Redmond,* 142 Kan. 417 [49 P.2d 1035, 103 A.L.R. 893], the issue before the court was the soundness of mind of one who has executed a will. The trial court admitted testimony of an examiner of questioned documents, based entirely upon the appearance of the signa-

ture, to the effect that the testator was in an abnormal mental condition at the time he signed the document. The Supreme Court of Kansas recognized that there was fair basis for non-expert inference of testator's mental faculties from the manner in which the signature was written. Against a contention that the subject was not a proper one for expert testimony, the court stated: " . . . because the fact that the question has not heretofore been specifically decided is not sufficient to warrant refusal to admit the testimony. If it were, growth of the common law would be arrested, and it would be frozen where it is.

"At the 1935 commencement, the president of Cornell University, addressing the graduates of the medical school, said there was a tendency on the part of the medical profession and on the part of the legal profession to act on the premise, 'Whatever was, is right.' A decision by this court that the testimony should have been excluded because there is no established rule of evidence authorizing its admission, would demonstrate soundness of the criticism.''

The autopsy surgeon should have been permitted to state whether or not she had an opinion concerning the defendant's mental state derived from her study of the nature and circumstances of the homicide and the means used to accomplish it. Very often an expert in the medical field has formed no opinion as to the particular cause of injury or mental condition, although other members of her profession might have done so.

However, the witness was not asked these preliminary questions. The inquiry directed to her assumed both that such an opinion could be formed by an expert from the data at hand, and that the witness had formed such opinion. Uuder these circumstances the ruling sustaining the objection was correct only upon the ground that no proper foundation for the question had been laid. There was no attempt by counsel to follow up with questions as to whether such opinion could be formed and whether the autopsy surgeon had any opinion on the subject. It may not be assumed that the court would have restricted his examination for that purpose. In previous inquiry as to the type of instruments which caused Mrs. Maniscallo's death, counsel had properly asked the witness if she had an opinion as to the instruments used before asking for that opinion.

The appellant asserts that the trial judge erred in failing to instruct the jury that evidence of the oral admissions of a

defendant are to be viewed with caution. This error was allegedly rendered more serious by the instruction given on circumstantial evidence. In determining that no substantial prejudice resulted, the majority opinion relies upon testimony of two court appointed alienists which was received ''[O]n the trial of the issue of insanity (a part of the 'entire cause' which it is our duty to examine [Cal. Const. art VI, § 4½]) . . . ''

I agree that no substantial prejudice resulted from the omission of the instruction, but prejudice could not have been cured or lessened by evidence offered upon the trial of the issue of insanity. At that time the jury had returned its verdict finding Letourneau guilty. The determination of guilt had been made upon the evidence received in the trial of the general issue and the instructions of the court applicable to that evidence. It was then too late for the jurors to reconsider the question of Letourneau's guilt or innocence in the light of the evidence presented on the issue of insanity had they desired to do so.

For these reasons I concur in the judgment.

CARTER, J.—I dissent.

Again we have an acknowledgment of the rule that evidence of mental condition is admissible on the trial of the ''not guilty'' plea as bearing on premeditation, intent, and malice, followed by the refusal to apply it. The same paradox is presented as that which existed in *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53], and *People* v. *Danielly,* 33 Cal.2d 362 [202 P.2d 18], where, in my dissents, I pointed out the injustice which is bound to flow therefrom. This case presents another illustration of the hopeless position occupied by counsel and the trial court in attempting to present evidence on the subject, and the plain intent of this court to find some reason for not applying the rule it has declared to be applicable.

In the *Wells* case, *supra,* it was held that testimony of a physician who had examined defendant was material and pertinent to the issue, but its exclusion was not prejudicial. In the *Danielly* case other grounds for refusal to apply the rule were borne and given vitality in the fertile mind bent on withholding the benefit of the rule from the defendant. There a physician was offered as a witness to show that defendant did not possess the mental faculties for forming an intent or premeditation, but the majority found it irrelevant, and that the offer of proof was insufficient. Thus the *Wells* case was

deserted in its holding of materiality. In the case at bar, the court again uses irrelevancy and failure to make an offer of proof, adding a "kicker" that no foundation was laid. Defendant put a question to the autopsy surgeon, a duly qualified physician, as to whether the manner in which the bodies were mutilated in the course of the killings would show an abnormal mind. On the score of lack of foundation, whatever may be meant by that, there are several answers. If the "foundation" argument refers to qualification, the parties stipulated to the doctor's qualifications. *No objection was made on the ground of insufficient foundation.* If it is meant that there was no showing that the manner of killing would have a bearing upon the mental state of the defendant, the answers are even more numerous. In addition to those above mentioned, it should be noted that neither the trial court nor this court knows whether a physician may given an opinion on mental condition from the manner in which the killing was accomplished. The majority opinion makes the situation even worse when it says: " . . . it will not be presumed that from mere examination of the wounds, the autopsy doctor could do more than speculate as to what the state of the mind of the killer . . . might have been; . . ." It will not presume a doctor could so testify, but by its very holding *it presumes conclusively* that *he could not so testify.* In other words, it assumes to know what it holds a doctor cannot know, and precludes the ascertaining of what a doctor may or may not know in his field. Lying at the base of the holding must be the thought that the offer of proof was not sufficient, but the court clearly indicated its intent that no evidence of that class—mental state, would be allowed and therefore an offer of proof is unnecessary. (*People* v. *Duane,* 21 Cal.2d 71 [130 P.2d 123] ; *Caminetti* v. *Pacific Mut. Life Ins. Co.,* 23 Cal.2d 94 [142 P.2d 741] ; *Lawless* v. *Calaway,* 24 Cal.2d 81 [147 P.2d 604] ; *Heimann* v. *City of Los Angeles,* 30 Cal.2d 746 [185 P.2d 597].) I say that must be the real basis, for the majority states: "There is no showing that the doctor had, or legitimately could form an opinion which could aid the jury in determining the state of mind of the killer who inflicted the wounds." That is to say, it demands that defendant show that the doctor's answer would be favorable to him. We are not told *how* he is expected to show that or that a doctor could give an opinion on mental state from the circumstances of the killing. By sustaining the objection to the question put to the doctor, he is foreclosed from showing those very things that the majority criticizes him for failing to

establish. From all that appears, the doctor may have had an opinion on defendant's mental state and been able to justify it by his learning and knowledge that there is a rational connection between a person's mental condition and the manner in which he commits a homicide.

I also agree with Justice Edmonds that prejudicial error at the trial on the not guilty plea is not cured by evidence offered upon the trial of the issue of insanity.

In my opinion, the errors committed during the trial were prejudicial and justify a reversal of the judgment.

Traynor, J., concurred.

Appellant's petition for a rehearing was denied December 27, 1949. Edmonds, J., Carter, J., and Traynor, J., voted for a rehearing.