Filed 3/17/16  P. v. Wenke CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LAURA JEAN WENKE,<br><br>    Defendant and Appellant. | A142905<br><br>(San Mateo County<br>Super. Ct. No. SC075652A) |

Defendant Laura Jean Wenke stabbed her ex-husband, Randall Wenke,[1] in the neck and chest.  She was charged with and convicted of attempted murder, assault with a knife, assault with a stun gun or taser, and infliction of corporal injury.  The jury also rejected defendant's plea of not guilty by reason of insanity.  Defendant now appeals, arguing the trial court erred in:  (1) excluding Randall's civil complaint alleging malpractice against defendant's mental health professionals; (2) admitting evidence of a prior incident of domestic violence pursuant to Evidence Code section 1109; and (3) rejecting defendant's request for a rebuttal closing argument during the sanity phase of the trial.  We affirm.

## I.  BACKGROUND

Defendant was charged by information with:  (1) attempted murder (Pen. Code, §§ 664, 187, subd. (a)); (2) assault with a knife (*id*., § 245, subd. (a)(1)); (3) assault with a stun gun or taser (*id*., § 244.5, subd. (b)); and (4) infliction of corporal injury (*id*.,

_____

[1]  As Randall shares defendant's last name, we refer to him by his first name.  We mean no disrespect in doing so.

§ 273.5, subd. (a)).  The information also contained enhancement allegations for personal infliction of great bodily injury, infliction of great bodily injury involving domestic violence, use of a knife as a deadly weapon, and serious and violent strike offenses. Defendant pleaded not guilty and not guilty by reason of insanity.  On June 3, 2014, a jury found defendant guilty of all charges and found true all the alleged enhancements. On June 11, 2014, the jury found appellant was sane when she committed the offenses. Defendant was sentenced to 11 years to life.

The charges arose out of defendant's attack on her ex-husband, Randall, on September 15, 2011.  Defendant and Randall met in 1990 and were married from about 1998 to about 2009.  Their son was born in 2003.  In 1994, while they were still dating, defendant and Randall started a business together, Wenke Construction, Inc.  Randall acted as the field manager, while defendant managed the office work and billing.

In 2007, defendant struck Randall in the face during an argument.  As a result, Randall lost hearing in one ear for a few days, and continues to have ringing in his ear. Defendant was arrested and ordered to complete 50 hours of counseling for anger management.  To comply with the court order, defendant saw psychiatrist Dr. Kenneth Woodrow, first with Randall and then by herself, until November 2009.  Woodrow diagnosed defendant with "obsessive compulsive personality," and "self defeating personality" with "narcissistic features."

Defendant and Randall separated in September 2009, and defendant filed for divorce in August 2010.  They continued to work as business partners, but met in person only a handful of times and primarily communicated through e-mail and text messages. Defendant retained primary custody of the couple's son, and Randall had custody 20 percent of the time.

In February 2011, defendant began seeing a psychologist, Dr. Susan Buchholz. Dr. Buchholz diagnosed defendant with generalized anxiety disorder, and believed defendant might also suffer from the more specific anxiety diagnosis of obsessive compulsive disorder.  Her husband, Dr. William Buchholz, an oncologist and hematologist, prescribed defendant Lexapro, as well as Ativan, a tranquilizer for

2

defendant's anxiety. Defendant found the Ativan made her sleepy, but reported no other side effects.

Defendant stopped making appointments with Dr. Susan Buchholz in May 2011. In September 2011, defendant called Buchholz and told her she was not taking the Lexapro regularly because of finances and increased stress. Buchholz instructed defendant to resume the medication, and set an appointment for September 14, 2011, the day before the crime. When asked if defendant reported gaps in memory at this appointment, Buccholz responded: "No, she was attentive and wanting to settle things in her divorce and the financial situation."

Sometime before the crime, defendant acquired a Wenke Construction pickup truck and had the business logo removed from the doors. On September 7, 2011, defendant created a Yahoo! e-mail account for "Perry Hadden." Posing as Hadden, defendant e-mailed Randall about a potential project for Wenke Construction. Randall agreed to meet Hadden at the Wenke Construction office on September 15, 2011, at 7:15 p.m.

Defendant arranged for Katherine Thomas to babysit the Wenkes' son on the evening of September 15, 2011. The job was arranged a week in advance, which Thomas said was unusual. Defendant told Thomas she was going running.[2] Thomas had never known defendant to go running before. Defendant usually dressed "professionally," but on this night Thomas noticed defendant was wearing elastic pants and a long baggy sweatshirt. Before defendant left, she gave Thomas a Vogue magazine and her car keys, which Thomas thought strange because she was too young to drive.

Defendant called Randall Wenke from her cell phone at around 6:30 or 7:00 p.m. and told him she was coming into the office to show him something. Randall found this unusual because, since the divorce, defendant no longer spoke to him by telephone and did not come into the office. It was also unusual because it was past the time Randall

---

[2] Earlier in the day, defendant had texted Mary Magee, her neighbor and regular walking partner, saying: "So are you going to the Y? I'll meet you there." Magee testified they had not discussed going to the Y, and had never been there together.

would normally leave the office.  Randall told defendant he could not see her in person because he was meeting a new client that night.  Defendant responded:  "[D]on't worry, I'll be gone before he shows up."

About 10 minutes later, defendant arrived at the office in the company truck she had recently acquired.  Randall was struck that defendant was wearing coveralls, as she was always dressed "to the nines."  Defendant explained she was playing the part of a security guard in a community play.  When Randall asked defendant where their son was, defendant responded he was at a play date.  Defendant then told Randall she wanted to show him a procedure on a computer in her old office.  Randall thought this odd, but he agreed because he wanted to "get her out of there."

Randall described defendant's attack as follows:  As he started to log in into the computer, defendant came up from behind and stabbed him in the neck.  Randall turned and saw defendant come at him with a knife in one hand and a stun gun in the other.  Randall stood up and grabbed defendant's wrists, but she continued to fight.  Randall heard the stun gun "going pop-pop-pop-pop the whole time."  Randall and defendant wrestled, and eventually Randall threw defendant to the ground.  Thinking the altercation was over, Randall released defendant's knife hand.  Defendant then stabbed Randall in the chest, right above his heart.  Randall picked up defendant by the wrists and threw her into the hallway.  He wrestled the stun gun out of her hand, retrieved his phone, went out into the street, and called 911.

Defendant also called 911.  She told the dispatcher she was showing her husband "something," he thought she was attacking him, and he "started flailing around and threw me to the ground and I said, I'm . . . not doing anything."  When asked if anyone was injured, defendant responded:  "I don't know because I had this . . . little knife and he was waving it around."  At trial, defendant testified she had showed Randall the stun gun, and then he became angry and charged her "like a football player."  Defendant claimed she could not remember many of the details of the incident, including the knife, and she had not planned to kill Randall.  Defendant also claimed she sometimes had memory lapses, which could last up to half a day.

4

The police arrived on the scene and placed defendant under arrest. They found defendant had wrapped her torso in at least three layers of bubble wrap under her jumpsuit. After obtaining a warrant, the police searched defendant's truck. Inside the truck's cab, the police discovered a translucent mask with a mustache and eyeglasses and a pair of latex gloves.

In the bed of the truck, the police found a five-gallon bucket containing three cans of linseed oil and various rags. Defendant was aware linseed oil was highly combustible, since several years earlier, rags soaked with linseed oil had spontaneously caught fire in her garage. At trial, defendant asserted she intended to use the linseed oil to clean the baseboards at the office. However, Randall testified "everything" at the office was Formica, and thus did not require linseed oil to clean. The police also found the batteries had been removed from all of the smoke detectors in the office.

Inside defendant's purse, the police discovered an index card with a handwritten note stating: "Perry Hadden"; "Perry.Hadden@yahoo.com"; and the two addresses "Perry Hadden" had instructed Randall to inspect before attending their meeting. Defendant admitted the handwriting on this card was hers, but she had no recollection of having prepared it, and she denied posing as Perry Hadden.

Defendant's purse also contained a handwritten list. Defendant acknowledged the list was in her handwriting, but she testified she had no recollection of having made the list. The list stated:

"□ p/u truck from Andronico's
"□ dress @ 105 Freemont
"□ exit El Monte stoplight wearing mask
"□ call Randy

"□ make sure its done
"□ don't stare
"□ turn off lights
"□ pencil email to KR
"□ Amazon wish list
"□ turn off R's cell phone, battery out
"□ check fire alarms
"□ outside paint bucket for closet

"□ close kitchen blinds
"□ set up attic
"□ put back closet lid
"□ bag everything prior to truck
"□ turn off power breakers
"□ lock door behind you

"□ knife @ KFC Woodside
"□ suite dumpster across street
"□ Middlefield—boots
"□ keep hat & mask on
"□ ~~take off mask hat @ Safeway CVS~~
"□ park truck South Drive, move seat back
"□ take mask off after parking
"□ cleanup face & neck w/ wipes
"□ mask, hat[,] gloves, wipes thrown away on jog home

"□ call Mary

"□ shred plan
"□ college for [son]
"□ take out laptop drive
"□ email where is truck
"□ laundry/shower"

The police also executed a search warrant of defendant's residence. There they found an April 27, 2011 letter from defendant's insurance broker stating a $2 million term life insurance policy on Randall would expire in January 2012 and the premiums would increase. At trial, Randall claimed he was unaware of the existence of the policy. When asked to explain his signature on the document, Randall stated that, in the course of running the business, defendant provided him with stacks of documents and told him where to sign, and he often signed those documents without reading them.

Defendant's blood was drawn on September 16, 2011 at 12:07 a.m. Ativan was present in defendant's system at .02 milligrams per liter. The effective level of the drug is .02 to .25 milligrams per liter. Dr. Alex Stalcup, a pharmacology expert, testified he would not expect to see any appreciable effect with this sort of dosage in the blood. Lexapro was also present in defendant's blood at .07 milligrams per liter. The effective

6

level of Lexapro is .02 to .20 milligrams per liter.  Stalcup characterized .07 milligrams per liter as "[v]ery, very low, probably below the level that would produce any effect at all."

Defendant presented the testimony of several mental health professionals during the guilt phase of the trial.  Dr. Tara Collins, defendant's jail psychiatrist, diagnosed defendant with depression, generalized anxiety disorder, PTSD, and adjustment disorder.  Dr. George Wilkinson diagnosed defendant with dissociative disorder, not otherwise specified, generalized anxiety disorder, and major depressive disorder.  Dr. Wilkinson opined that, because defendant suffered from dissociative disorder and had started and stopped the Lexapro and Ativan, she could have been suffering from mania at the time of the crime.  Dr. Hugh Solvason concluded defendant was suffering from psychotic depression when he interviewed her shortly before trial, but he could not opine on her mental state at the time of the offense.

In rebuttal, the prosecution called defendant's treating physicians and its own forensic psychologist.  Dr. Woodrow testified defendant was not suffering from depression or PTSD when he treated her.  Likewise, Dr. Susan Buchholz testified that, during her treatment of defendant, she did not notice any signs of dissociative disorder.  Nor did Dr. Buchholz notice signs of mania when she met with defendant on the day before the crime.  After reviewing defendant's records, Dr. Jonathan French, the prosecution's forensic psychologist, found no evidence defendant suffered from PTSD, bipolar episodes, or mania.  He noted that during her police interrogation, defendant "was absolutely lucid, focused, able to converse with the detectives even when the interrogation became somewhat confrontational."

The jury also heard from several mental health experts during the sanity phase of the trial.  Testifying for defendant, Dr. Jeffrey Kline stated defendant "fell into a dissociative state sometime prior to the offense, it was occurring during the offense, she was not aware of it, she popped out of it afterwards.  This impaired her sense of reality and she was not capable of understanding the nature, quality or wrongfulness of her actions during the offense."  Dr. James Missett testified defendant suffered from

7

psychosis and recurrent mental and emotional problems for months prior to the crime, and thus was "vulnerable to the medications and to their effect on her and at the time of the incident on September the 15th . . . she was insane." Dr. French once again testified on behalf of the prosecution.

## II. DISCUSSION

### A. *Randall's Civil Complaint*

In 2013, Randall filed a verified civil complaint against defendant for, inter alia, battery, assault, and intentional infliction of emotional distress. The complaint also asserted a claim for medical malpractice against a number of doe defendants, alleging defendant's attack on Randall was a result of the does' failure to exercise reasonable care in treating defendant's mental illness. Defendant now argues the trial court erred in refusing to admit the civil complaint. We disagree and also find any error was harmless.

During his case-in-chief, the prosecutor asked Randall about the civil complaint. Randall testified he brought the suit because of money, explaining: "[M]oney is very powerful to the defendant, and to allow her to have any money is a very dangerous thing for me because she has proven to, as soon as she is powerful and has money nothing stands in her way. So that was the basis of my decision to do a civil case on her." On cross-examination by defense counsel, Randall conceded the civil suit gave him a financial interest in the outcome of the criminal trial. Randall also asserted defendant was the only person being sued in the civil litigation. When defense counsel pressed him on the issue by reading the malpractice allegations in the complaint, Randall claimed ignorance and then the prosecutor objected to the line of questioning. The trial court sustained the objection, stating Randall could be recalled on the issue. Shortly thereafter, Randall said: "I apologize if I missed a part of this suing a doctor or psychiatrist." Randall also claimed he "had no idea" defendant was having psychiatric problems when they were together, while conceding defendant was having "emotional problems." The court heard additional arguments on the complaint outside of the presence of the jury, but after a recess defense counsel asked the court not to rule on the issue at that time.

8

Defendant later filed a motion to admit the civil complaint into evidence, arguing the inconsistencies between Randall's testimony and the verified complaint were relevant to Randall's overall credibility, as well as his assertions regarding defendant's mental health. The trial court denied the motion in a written order. The court found the civil complaint was not relevant to Randall's credibility. The court explained the complaint merely showed that in the two years after the crime either Randall or his attorney came to believe there was a cause of action for medical malpractice against defendant's treatment providers. The court also stated Randall was not a trained medical professional and his verification of the complaint—in which he attested the information within his personal knowledge was correct and that he was informed and believed the information supplied by his attorneys was also correct—did not establish he had personal knowledge relating to the alleged medical malpractice of the doe defendants. Even if the complaint was relevant, reasoned the court, its probative value was completely outweighed by the risk of confusing the jury. Admitting the complaint could open the door to testimony by Randall's attorney in the civil action about who formulated the tactical plan underlying the case, and other matters irrelevant to defendant's guilt or innocence.

The trial court's decision to exclude the civil complaint is governed by Evidence Code section 352, which states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We will reverse only if the court's ruling was 'arbitrary, whimsical, or capricious as a matter of law.'" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

We conclude the decision to exclude the civil complaint was well founded. As the trial court held, the probative value of the complaint was minimal. The complaint shows Randall or his attorneys believed Randall had a colorable cause of action for malpractice against one or more of defendant's treating physicians. However, it does not prove Randall believed defendant was insane when she committed the offense, or that she lacked the requisite intent or was otherwise subject to uncontrollable impulsive behavior.

9

And since the mental health professionals in the malpractice claim are named as doe defendants, the complaint sheds little light on the nature of their alleged malpractice or defendant's mental state. In any event, since Randall is not an expert or trained mental health professional, his opinion of defendant's sanity was irrelevant. Defendant argues Randall tried to cover up her deteriorating mental condition in the months leading up to the offense. But the exclusion of the civil complaint did not bar defense counsel from questioning Randall concerning his personal knowledge and observations of defendant's behavior to establish her mental state.

Moreover, the complaint had little bearing on Randall's credibility. It is true Randall mischaracterized the civil complaint when he asserted he was only suing defendant and not any of her treating physicians. But defense counsel effectively impeached that testimony without introducing the complaint. Randall later conceded he "missed a part" about the medical malpractice claim. The jury also heard Dr. William Buchholz testify that he and his wife were being sued over their treatment of defendant. Based on this evidence, it should have been clear to the jury that Randall's earlier testimony misrepresented the content of the civil complaint. Thus, contrary to defendant's argument, exclusion of the complaint did not violate defendant's Sixth Amendment right to cross-examination.

On the other side of the scale, there was a substantial danger that admission of the civil complaint would confuse the issues and mislead the jury. Randall's assertion of a claim for medical malpractice has no bearing on whether defendant committed the offenses at issue. Nor does it prove Randall believed defendant was insane when defendant committed the offenses. And as the trial court held, admitting the complaint could have opened the door to lengthy and largely irrelevant testimony concerning Randall's strategy and motivation for filing the civil action. The primary issues at trial concerned whether defendant initiated the altercation with Randall and her mental state at the time. Evidence concerning the legal strategy underlying Randall's civil complaint was beside the point.

10

The authority cited by defendant on this issue is inapposite. In *Davis v. Alaska* (1974) 415 U.S. 308, the trial court precluded the defendant from questioning a key prosecution witness concerning his juvenile record. (*Id.* at pp. 310–311.) The defendant wanted to use this evidence to show the witness falsely identified the defendant to shift suspicion away from himself and may have been subject undue pressure from police. (*Id.* at p. 311.) The Supreme Court found the trial court's ruling violated the defendant's Sixth Amendment right to cross-examination, as the accuracy and truthfulness of the witness's testimony were key elements in the state's case against the defendant. (*Id.* at pp. 315–317.) Likewise, in *Delaware v. Van Arsdall* (1986) 475 U.S. 673, the Supreme Court found the defendant's Sixth Amendment rights were violated where he was precluded from cross-examining a witness concerning potential bias stemming from the state's dismissal of public drunkenness charge against the witness. (*Id.* at pp. 676, 679.) In contrast, here, defendant was permitted to cross-examine Randall concerning his financial interest in the case, as well as his perceptions of defendant in the months before the crime. The jury also heard evidence indicating Randall misrepresented the scope of his civil complaint. While the trial court did not allow the civil complaint into evidence, that ruling did not restrict defendant's right to cross-examination in any meaningful way.

Even if the trial court erred in excluding the civil complaint, the error was harmless as it was not reasonably probable defendant would have obtained a more favorable outcome if the complaint was admitted. (See *People v. Watson* (1956) 46 Cal.2d 818, 837.)[3] Defendant asserts that, had she been permitted to impeach Randall with the civil complaint, the jury may have believed her claim that Randall initiated the confrontation with defendant after he was startled by the stun gun. But even without Randall's testimony, there was overwhelming evidence defendant went to Randall's office with the intent of killing him. The note card found in defendant's purse and

---

[3] Defendant argues we should apply the stricter standard for harmless error enunciated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). *Chapman* is inapplicable here because the exclusion of the civil complaint did not implicate defendant's constitutional rights.

various e-mails sent from a Yahoo! account show defendant tricked Randall into staying late at the office by assuming the identity of "Perry Hadden" and arranging a meeting to discuss a potential project. Defendant's own account of the evening is wildly inconsistent. At trial, she testified she went to Randall's office to drop off some boxes and cleaning supplies. But before departing for the office, defendant told her babysitter she was going for a run, and she told her neighbor she was going to the gym. Most damning of all, defendant composed a to-do list of steps for carrying out and covering up the crime. Those steps included picking up the getaway vehicle, changing outfits, "[m]ak[ing] sure its done," burning down the office, and disposing of the evidence. Further corroborating the prosecution's theory that defendant intended to burn down the office to cover up the crime, the police found the batteries had been taken out of the office smoke detectors. Additionally, in the bed of defendant's truck, the police found rags and linseed oil, which defendant knew from experience could spontaneously combust.

Defendant further argues the jury might have found her insane "had they known [Randall's] true experiences with and perceptions of [defendant] . . . during the course of 2011." But the civil complaint sheds no light on Randall's personal observations of defendant's mental state, and defendant was free to cross-examine Randall on the subject. Moreover, Randall's opinions about defendant's sanity had little probative value, especially since multiple mental health professionals testified on the issue at trial.

**B.    *Evidence of Domestic Violence***

Next, defendant argues the trial court erred in admitting evidence of a prior incident of domestic violence under Evidence Code section 1109, specifically the 2007 incident in which defendant slapped Randall's ear his with her open palm. Notwithstanding recent cases affirming the constitutionality of Evidence Code section 1109, including Division Three's opinion in *People v. Jennings* (2000) 81 Cal.App.4th 1301, defendant argues the statute violates due process. Defendant further argues the domestic violence evidence should have been excluded under Evidence Code section 352 because its probative value was outweighed by the risk of undue prejudice.

12

We agree with our colleagues in Division Three that the constitutionality of Evidence Code section 1109 has been settled. (*People v. Jennings*, *supra*, 81 Cal.App.4th at p. 1310.) We also find that any error in admitting the domestic violence evidence was harmless. (See *People v. Watson*, *supra*, 46 Cal.2d 818, 836.) It is highly unlikely the jury would seek to punish defendant for slapping her husband by convicting her of attempted murder. Moreover, with or without the evidence of prior domestic abuse, the prosecution's case against defendant was exceptionally strong; indeed, overwhelming. Defendant did not deny stabbing Randall in the neck and chest. Her defense was that Randall initiated the confrontation, she lacked the requisite intent, and she was insane at the time she committed the offenses. Evidence of the 2007 incident did not undermine any of these defenses. Further, as discussed above, the prosecution presented overwhelming evidence of premeditation, including evidence defendant prepared a to-do list for carrying out the crime. (See section II.A, *ante*.)

## C.    *Closing Arguments*

Defendant argues the trial court erred in rejecting her request for a rebuttal closing argument during the sanity phase of the trial. We disagree and also find any error was harmless.

As an initial matter, defendant did not have a statutory right to offer a rebuttal argument during the sanity phase. Penal Code section 1093, subdivision (e), states the district attorney has the right to "close" during the guilt phase of a trial, but there is no parallel statute governing a defendant's closing arguments for the sanity phase of a trial. Penal Code section 1026 allows for a jury trial for a plea of not guilty by reason of insanity, but states nothing about the order of closing arguments.

Further, our Supreme Court expressly rejected the contention that a defendant is entitled to a rebuttal argument during the sanity phase in both *People v. Kimball* (1936) 5 Cal.2d 608, 611 (*Kimball*) and *People v. Letourneau* (1949) 34 Cal.2d 478, 495 (*Letourneau*). Defendant appears to argue *Letourneau* was wrongly decided because one of the cases on which it relied, *People v. Lee* (1930) 108 Cal.App. 609 (*Lee*), reached a contrary holding. But the Supreme Court was not bound by the appellate court's decision

in *Lee*. In any event, *Lee* did not reach the issue of whether the defendant had a right to rebuttal during the sanity phase. It merely held that while defendant's right to rebuttal may have been "conceded," defendant waived any argument concerning that right by declining to request a rebuttal argument at trial. (*Lee*, at pp. 612–613.)

Defendant further argues *Kimball*, *supra*, 5 Cal.2d 608 and *Letourneau*, *supra*, 34 Cal.2d 478, which were decided in 1936 and 1949, respectively, are no longer good law. She points to the Second Appellate District's more recent opinion in *People v. Hendricks* (1992) 11 Cal.App.4th 126. That case is inapposite, as the court merely held there was no error in allowing the prosecutor to make the first opening argument and to be the first to introduce evidence during the sanity phase of a trial. (*People v. Hendricks*, at p. 130.) As defendant points out, while reciting the procedural history, the court also stated: "The defense was then permitted to open and close argument to the jury." (*Ibid.*) However, at no point did the court state the defense had a *right* to open and close argument. Indeed, the issue was not even raised on appeal.

Defendant also contends that, in *Cotter v. California* (1967) 386 U.S. 274, the United States Supreme Court rejected the California Supreme Court's approval of *Letourneau*, *supra*, 34 Cal.2d 478, as discussed in *People v. Cotter* (1965) 63 Cal.2d 386, 398. Not so. *Cotter v. California* is a per curiam opinion in which the United States Supreme Court vacated the judgment in *People v. Cotter* and remanded the case for further consideration in light of its decision in *Chapman*, *supra*, 386 U.S. 18. The opinion makes no mention of *Letourneau* or of the issue of a defendant's right to a rebuttal argument.

*Wardius v. Oregon* (1973) 412 U.S. 470 (*Wardius*), is also inapposite. There, the United States Supreme Court reversed a criminal conviction where the trial court prevented the defendant from introducing any evidence to support his alibi defense as a sanction for his failure to comply with a notice-of-alibi rule. (*Id.* at p. 471.) The court held that due process forbade the enforcement of such alibi rules unless reciprocal discovery rights were given to criminal defendants. (*Ibid.*) In a footnote, the court stated: "This Court has therefore been particularly suspicious of state trial rules which

14

provide nonreciprocal benefits to the State when the lack of reciprocity interferes with the defendant's ability to secure a fair trial." (*Id.* at p. 474, fn. 6.)

Defendant argues the trial court's ruling here provided a nonreciprocal benefit to the prosecution, as the prosecution was allowed a rebuttal argument during the guilt phase of the trial when it had the burden of proof, but defendant was not allowed a rebuttal when she had the burden of proof during the sanity phase. However, there is a significant difference between the reciprocal discovery rights at issue in *Wardius*, *supra*, 412 U.S. 470, and the right to a rebuttal closing argument during the sanity trial at issue here. Further, it is entirely unclear how the trial court's order prejudiced defendant or denied her a fair trial, especially since she has yet to enunciate what she would have argued in rebuttal had she been given the opportunity.

**D.**     *Cumulative Error*

Finally, defendant argues the cumulative effect of the exclusion of the civil complaint, the admission of evidence of a prior incident of domestic violence, and the denial of defendant's request for a rebuttal argument requires reversal. As discussed above, we find the trial court did not err in excluding the civil complaint or by limiting defendant's closing arguments. We also find defendant suffered no prejudice from the admission of propensity evidence.

## III.  DISPOSITION

The judgment is affirmed.

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
BANKE, J.

A142905

16